In re William J. McLAREN, Debtor.

Sylvio MARGIOTTA, Trustee, et al., Plaintiffs,

v.

William J. McLAREN, Defendant.

Bankruptcy No. B88–04828.
Adv. No. B89–0089.

United States Bankruptcy Court,
N.D. Ohio.

July 12, 1990.

Steven L. Gardner, Thomas C. Schrader, McDonald, Hopkins, Burke & Haber Co., LPA, Cleveland, Ohio, for plaintiffs.

Robert M. McIntyre, Mark F. Kruse, McIntyre, Kahn & Kruse Co., LPA, and Thomas C. Pavlik, Sindell, Rubenstein, Einbund, Pavlik, Novak & Celebrezze, Cleveland, Ohio, for defendant.

**924**

## MEMORANDUM ON DEBTOR'S MOTION TO DISQUALIFY PLAINTIFF'S COUNSEL

DAVID F. SNOW, Bankruptcy Judge.

On December 22, 1988 Debtor, William J. McLaren, filed a petition for reorganization under chapter 11 of the Bankruptcy Code. The case was converted to chapter 7 on January 22, 1990 on the motion of National City Bank when it appeared that there was no realistic prospect for reorganization. On March 21, 1989 plaintiffs initiated this adversary proceeding requesting a determination that their claims against the Debtor are nondischargeable under subsections 523(a)(2) and (a)(4) of the Bankruptcy Code. Broadly speaking these subsections deny discharge of claims arising out of fraudulent conduct by the Debtor.[1]

This has been a contentious adversary proceeding marked by discovery disputes occasioned by Debtor's failure to appear at scheduled depositions or to produce documents requested by plaintiffs. On May 23, 1989 plaintiffs filed a motion for sanctions against the Debtor for failure to attend a deposition. This motion was practically superseded, although not formally ruled upon, in connection with plaintiffs' further discovery efforts and the Debtor's agreement to a consent judgment providing that the Debtor would produce documents not later than July 15, 1989 or a default judgment would be entered against the Debtor. On August 29, 1989 plaintiffs filed their motion for default judgment based on Debtor's continued failure to comply with agreed discovery arrangements. Although it appeared that Debtor had failed to comply with his discovery obligations, the Court denied plaintiffs' motion since it was not clear that Debtor's default fell squarely within the language of the consent judgment and there was some evidence that plaintiffs might have waived their right to enforce the consent judg-

ment. The Court was unwilling to deny the Debtor his discharge where such doubts existed.

On February 14, 1990 the Court issued a final pretrial order requiring completion of all discovery by April 27, 1990 on plaintiffs' part and by May 20, 1990 on the part of the Debtor. On May 18th, however, the Debtor filed a motion to disqualify plaintiffs' counsel on the ground that Debtor's former counsel, James A. Griffith, and his firm, Burke, Haber & Berick, L.P.A. ("Burke Haber"), had merged with plaintiffs' counsel's firm of McDonald, Hopkins & Hardy Co., L.P.A. ("McDonald Hopkins"). This motion resulted in a flurry of briefs, affidavits, motions and memoranda. This issue was discussed at the regularly scheduled pretrial of this adversary proceeding on June 19, 1990 and the Court set June 27, 1990 as the date for an evidentiary hearing on plaintiffs' motion.

No testimonial evidence was presented as to the scope of Debtor's representation by Mr. Griffith or Burke Haber. Although plaintiffs did not concede the truth or accuracy of Debtor's affidavits relating to that representation, they stipulated that the Court could, solely for the purpose of deciding this motion, assume the facts stated in Debtor's affidavits. The evidence presented was limited to the issue of whether plaintiffs' counsel's efforts to insulate plaintiffs' representation from Burke Haber's prior representation of Debtor was effective. The sole witnesses at the June 27 hearing were four lawyers now practicing with plaintiffs' counsel's firm, three of whom were called by plaintiffs and one by the Debtor.

### Facts

The facts are largely undisputed. According to the Debtor's affidavit filed immediately prior to the June 19 pretrial,

---

1. Subsections 523(a)(2) and (a)(4) read in relevant part as follows:

A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

... (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

.... (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

Debtor first retained James Griffith in 1958. Shortly thereafter, Mr. Griffith was employed by a business firm; he returned to private practice with the firm of Roudebush and Brown in the late 1970's and resumed doing legal work for the Debtor. Mr. Griffith joined Burke, Haber in 1985 where he continued to represent the Debtor. According to the Debtor's affidavit, Mr. Griffith handled virtually all of the Debtor's personal and business legal matters, including the organization of various corporations and other entities for the Debtor. According to the Debtor, Mr. Griffith counseled him in respect of the claims of his creditors, including specifically the plaintiff Mr. Margiotta; arranged a bankruptcy conference during this period and prepared a power of attorney relating to the transfer of funds belonging to the plaintiffs. It is undisputed, however, that the attorney/client relationship between Mr. Griffith and Burke, Haber on the one hand and the Debtor on the other terminated in June 1987, a year and a half before the Debtor filed his petition in bankruptcy and a year and three quarters prior to the filing of this adversary proceeding.

Termination of the attorney/client relationship did not, however, end the relationship. In July 1989 Burke, Haber and Mr. Griffith filed an adversary proceeding against the Debtor to establish that certain claims were nondischargeable. Mr. Griffith filed a separate adversary proceeding arising out of the lease of a boat from an entity in which both the Debtor and the plaintiff, Mr. Margiotta, were principals. Both of these adversary proceedings were dismissed without prejudice at the instance of the plaintiffs in February 1990.

On March 31, 1990, Burke Haber and McDonald Hopkins joined forces under the firm name of McDonald, Hopkins, Burke & Haber Co., L.P.A. (the "New Firm"). The result of this affiliation was that both Mr. Griffith, Debtor's former attorney, and Mr. Gardner, the plaintiffs' attorney, became members of the same firm. According to Thomas Keen, president of the New Firm, potential problems arising out of Mr. Griffith's prior representation of the Debtor were discussed and arrangements were made prior to the affiliation of the two

firms to insulate the representation of plaintiffs from Mr. Griffith's prior representation of the Debtor.

In late March, Mr. Keen instructed Mr. Gardner and Mr. Griffith that they were to have no contact with each other in respect of any matter relating to the Debtor. He instructed Mr. Griffith to segregate the Debtor's files and lock them up so that other firm personnel would not have access to them. Mr. Gardner subsequently instructed Mr. Ehrnfelt, who was working with him on plaintiffs' cases, not to have contact with Mr. Griffith on matters relating to the Debtor or his affiliates.

Burke Haber had occupied three floors of the National City Bank Building. Following the affiliation of the two firms, the New Firm subleased two of these floors. One was retained by old Burke Haber in connection with its disposition of matters which had not been transferred to the New Firm. Although most of the lawyers and other personnel that had comprised Burke Haber joined the New Firm, it did not assume Burke Haber's obligations except those related to ongoing client matters and the old Burke Haber firm had the responsibility of dealing with matters not assumed by the New Firm. The Debtor's files were stored on the floor of the National City Bank Building retained by Burke Haber and locked in a closet. Only two persons had keys to that closet—Mr. Griffith and Judith Polly, the former Burke Haber office administrator who also took over certain office administration functions with the New Firm.

Notwithstanding Mr. Keen's order, Mr. Griffith apparently retained in his personal files one file of an entity affiliated with Debtor. In June this file was inadvertently opened as a file of the New Firm. Mr. Keen discovered this mistake in reviewing a list of the new files and promptly ordered Mr. Griffith to rectify it. That file was then locked in the closet designated for the Debtor's files. There is no indication that Mr. Griffith's failure to comply with Mr. Keen's directions in this regard resulted in any disclosure of information relating to Debtor or his affiliates. In fact there is no

evidence at all that Mr. Gardner or anyone else representing plaintiffs ever received any information relating to the Debtor or any entities with which he was involved from Mr. Griffith or any other Burke Haber lawyer or from any files of either.

Messrs. Gardner and Griffith had only two conversations relating to the Debtor, one in the summer of 1988 relating to Mr. Griffith's claim for rental of a boat leased from M.M. & E. Leasing Company and one in the summer of 1989 relating to Mr. Griffith's role as a trustee in the liquidating trust of M & E Lawn Care Services, Inc., both well prior to the merger of the two firms. Since that time there have been no conversations between the two; they have scrupulously avoided any conversation and have had only the most limited and perfunctory contact. Their lack of involvement has been facilitated by the fact that they occupy offices in different buildings.

The New Firm has approximately 55 lawyers and is organized into a number of departments including estate planning, employee benefits, litigation and business law. Mr. Gardner, a member of the litigation department, was, as a partner of McDonald Hopkins, located at the Huntington Building prior to the merger. Shortly thereafter his office was moved to former Burke Haber space in the National City Bank Building subleased from Burke Haber. Mr. Griffith is a member of the business department; his office is in the East Ohio Gas Building. Although Mr. Griffith is a shareholder of the New Firm, he does not share in profits and therefore will not participate in any fees received from the plaintiffs by the New Firm.

Mr. Gardner's representation of Mr. Margiotta and related entities commenced in 1988. Since that time he has put in more than 700 hours of time on plaintiffs' cases, has reviewed very extensive documents and has billed plaintiffs over $100,000, about $90,000 of which has been paid. This time does not include time subsequent to Debtor's motion to disqualify the New Firm.

Debtor in effect concedes that there is no evidence of any disclosure of confidences which may have been imparted by the Debtor. However, he argues that the procedures instituted by the New Firm are too unstructured and informal to constitute the sort of "Chinese wall" which can effectively quarantine an attorney who received confidences from a former client. In support of his argument Debtor points out that Mr. Keen's directives to Messrs. Griffith and Gardner were oral; Debtor's files were never inventoried; no notices of the quarantine were put on the locked closet door where Debtor's files were stored; no notice of the quarantine, oral or written, was given generally to lawyers or to staff. Whether or not disclosure occurred, Debtor argues that the procedures instituted were inadequate to provide Debtor the requisite assurance that disclosure could not or will not occur.

## Legal Analysis

As Debtor's counsel recognizes, a Chinese wall may sometimes be effective to permit a firm to represent an interest even though one or more of its lawyers would be precluded from doing so under Disciplinary Rule 4–101 of the ABA Model Code of Professional Responsibility.[2] That rule provides in relevant part:

DR 4–101 PRESERVATION OF CONFIDENCES AND SECRETS OF A CLIENT.

(A) "Confidence" refers to information protected by the attorney-client privilege under applicable law, and "secret" refers to other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client.

(B) Except when permitted under DR 4–101(C), a lawyer shall not knowingly:

(1) Reveal a confidence or secret of his client.

---

**2.** The ABA Model Code of Professional Responsibility was adopted by the Ohio Supreme Court on October 5, 1970.

(2) Use a confidence or secret of his client to the disadvantage of the client.

(3) Use a confidence or secret of his client for the advantage of himself or of a third person, unless the client consents after full disclosure.

■ Disciplinary rules related to Canon 5 are inapplicable. That canon relates to conflicts or potential conflicts between current clients. The attorney/client relationship between Mr. Griffith/Burke, Haber and the Debtor had terminated long before these law firms joined forces or this lawsuit was filed. This point is important since Disciplinary Rule 5–105(D) expressly disqualifies the partners and associates of a tainted lawyer and therefore appears to preclude use of a Chinese wall. Disciplinary Rule 4–101 contains no such prohibition.

Disciplinary Rule 4–101 is designed to protect client confidences, whether or not the attorney/client relationship continues or has ended. The threshold question is whether the Debtor imparted any confidential information to Mr. Griffith or Burke Haber in connection with their representation of him which terminated in 1987. Plaintiffs contend strenuously that there is no evidence that plaintiffs' lawsuits against the Debtor involved any issues which were part of the Griffith representation; these lawsuits were neither filed nor threatened at the time that representation ceased, and plaintiffs argue that the Debtor has made only conclusory claims of confidence designed to delay and impede plaintiffs' prosecution of their lawsuit.

Debtor's first affidavit filed May 18 lent credence to plaintiffs' argument. It asserted legal conclusions but little or no detail. Debtor's second affidavit is more specific. It provides considerable detail and, as noted previously, paints a picture of a broad representation potentially, at least, encompassing matters that could be involved in plaintiffs' case. Pursuant to the parties' stipulation, the Court has for purposes of this hearing assumed the truth of its factual allegations. Even discounting the affidavits self-serving conclusions, they appear to provide a sufficient nexus between matters involved in the prior representation and the issues raised in this case to conclude that Mr. Griffith's prior representation of the Debtor would preclude him from representing the plaintiffs in this action under applicable Sixth Circuit authority.

In *General Electric Co. v. Valeron Corp.*, 608 F.2d 265 (6th Cir.1979), *cert. denied*, 445 U.S. 930, 100 S.Ct. 1318, 63 L.Ed.2d 763 (1980), the Sixth Circuit affirmed the district court's finding that an attorney's prior patent work for General Electric Co. was substantially related to a patent claim subsequently asserted against it by Valeron, although it did not appear that counsel had been involved with the patent or claim at issue when he represented General Electric some 10 years before. Under *Valeron* it appears that an ex-client may disqualify its former counsel from bringing a suit against it which may materially implicate the prior representation.

According to the Debtor's affidavit, Mr. Griffith represented him in connection with claims by his creditors, including Mr. Margiotta, and in connection with at least one entity in which the Debtor and Mr. Margiotta participated as partners. These relationships and others have resulted in claims against the Debtor amounting to more than $11.5 million and a number of adversary proceedings, including the plaintiffs', charging the Debtor with fraud and misappropriation. According to the Debtor, Mr. Griffith advised him in connection with creditor claims and arranged an exploratory meeting with bankruptcy counsel in respect of those claims. All this suggests that the Debtor's activities during the period of his representation by Mr. Griffith may be implicated in lawsuits based on the Debtor's alleged fraudulent conduct and misappropriation of funds.

■ Debtor also urges that Burke Haber's and Mr. Griffith's lawsuits against the Debtor, which were subsequently dismissed, add force to their disqualification argument. They certainly add to the rancor, but their application to Disciplinary Rule 4–101 is problematic. That rule is not intended to disarm an attorney from protecting his rights and reputation as against a former client. *See* D.R. 4–101(C)(4). There is no indication that there was any-

thing in the Burke Haber or Griffith suits which exacerbated the New Firm's problems under Disciplinary Rule 4–101. They were, in any event, dismissed prior to the formation of the New Firm. However, their hostile character reinforces the judgment that it would be improper for Mr. Griffith to represent the plaintiffs in a fraud action directed against the Debtor since he was privy to the Debtor's financial problems and the Debtor's attempts to cope with them. But such hostility is not a reason to deny effectiveness to a Chinese wall in this case. In fact, it appears that the New Firm's Chinese wall has isolated Mr. Griffith and shielded any confidences that may have been imparted to him from disclosure to plaintiffs' counsel to a greater extent than would have been the case had the firms not merged.

■ Under the Sixth Circuit authorities, however, the association of the two firms, and specifically of Messrs. Griffith and Gardner, gives rise to a presumption that confidences imparted by the Debtor to Mr. Griffith will be shared with plaintiffs' attorneys now that they are affiliated in the same firm. *Manning v. Waring, Cox, James, Sklar & Allen,* 849 F.2d 222, 225 (6th Cir.1988). The fact that the union was structured without a formal merger and without the New Firm assuming the debts of Burke Haber is not relevant to the existence of this presumption. *See Picker International Inc. v. Varian Associates, Inc.,* 670 F.Supp. 1363 (N.D.Ohio 1987) *aff'd,* 869 F.2d 578 (Fed.Cir.1989). However this union might differ from a merger, it was sufficient to invoke the presumption of shared confidences.

■ But it is clear under the authority of *Manning* that the presumption of shared confidences is rebuttable. Although Circuit Judge, now Chief Judge, Merritt dissented in part to the opinion in *Manning*, there is no indication in his dissent that he would reach a contrary conclusion on the efficacy of a Chinese wall if, as in this case, the issue were squarely presented. Moreover, *Manning* appears to reflect the generally shared view of the appropriate way to reconcile the mandate to protect the confidences of former clients with the right of current clients to retain the counsel selected by them in a legal milieu where mergers of firms and lateral movement of lawyers are prevalent. *See Schiessle v. Stephens,* 717 F.2d 417 (7th Cir.1983) and *LaSalle National Bank v. County of Lake,* 703 F.2d 252 (7th Cir.1983).

■ Since *Manning* the Board of Commissioners on Grievances and Discipline of the Supreme Court of Ohio, in Opinion 89–013 issued May 30, 1989, specifically endorsed *Manning's* position that the presumption of shared confidences under Disciplinary Rule 4–101 could be rebutted "by showing specific institutional mechanisms .... implemented to effectively insulate against the flow of confidentiality from the quarantined attorney to other members of his or her present firm." Debtor argues, however, that *Manning* is inapplicable because the procedures adopted by the New Firm were and are inadequate to constitute an effective Chinese wall as contemplated by the *Manning* case. In Debtor's view the wall was both too ephemeral, since it was based upon verbal directions, and too limited, since it did not include staff, sign-out or other policing mechanisms which, in Debtor's view, are mandated by the *Manning* case.

At this point it is not entirely clear what sort of mechanisms are required to rebut the presumption of shared confidences. In *City of Cleveland v. Cleveland Electric Illuminating Co.,* 440 F.Supp. 193 (N.D. Ohio 1977), *aff'd by order,* 573 F.2d 1310 (6th Cir.1977), *cert. denied,* 435 U.S. 996, 98 S.Ct. 1648, 56 L.Ed.2d 85 (1978), the court indicated that the departmental structure of the firm under inquiry was sufficient to rebut the presumption. The organization of the New Firm, quite apart from its Chinese wall, reduces the risk that any confidences imparted to Mr. Griffith or to Burke Haber would be disclosed intentionally or inadvertently to the New Firm's lawyers representing plaintiffs.

The New Firm is departmentalized. Messrs. Griffith and Gardner have offices in different buildings. The New Firm did not acquire the closed files of Burke Haber. Instead these files are maintained by Burke Haber on a separate floor not leased

to the New Firm and not containing files of the New Firm. As an organizational matter this structure makes it unlikely that there will be any inadvertent communications between Mr. Griffith and the lawyers representing plaintiffs or that the files of Burke Haber relating to Debtor or his affiliated entities will be accessed by plaintiffs' lawyers. Nevertheless, it is possible to agree with Debtor that something more than separate departments is required without concurring in his argument that that component was lacking here.

The Chinese wall should reflect a conscious recognition by the successor law firm of the need to protect the confidences of a former client who is now an adversary of a client represented by other lawyers in the firm. There must be a strategy reasonably designed to insulate the lawyers embarked on the continuing representation from those lawyers who formerly represented the other party and who would be precluded from participating in the ongoing representation by Disciplinary Rule 4–101.

In this case the New Firm met these criteria. The head of the New Firm specifically directed Messrs. Gardner and Griffith not to communicate in respect of any matter concerning the Debtor or the plaintiffs. It is clear from the evidence that this proscription has been faithfully observed by both. Mr. Keen's requirement that the Debtor's files be locked up and that access be limited to Mr. Griffith and Judith Polly, the office manager, was both an intelligent and effective mechanism to insulate access to those files. The fact that Mr. Griffith failed to follow through on that directive as to one of his personal files for about a two-month period was careless, but under the facts presented did not constitute a significant, let alone fatal, breach of the New Firm's Chinese wall. That failure was promptly rectified when it came to light; it appeared to involve a nonsensitive affiliate file and there is no indication that this file would have come to plaintiffs' counsels' attention in any event.

Debtor argues, however, that the wall must be built with writings—written constraints of the type imposed by Mr. Keen on Messrs. Griffith and Gardner, written sign out sheets and notices warning of the quarantine of the Debtor's files. These and other suggestions by Debtor, including inventorying the quarantined files, might well be useful but there is nothing under the facts of this case to suggest that they were necessary in order to provide both the fact and appearance of the insulation of plaintiffs' counsel from any confidences that may have been imparted by the Debtor to Mr. Griffith or Burke Haber.

Debtor concedes that there has been no wrongdoing on the part of plaintiffs' counsel, but urges that counsel failed to institute the necessary formal steps to make its Chinese wall effective. It cites *Papanicolaou v. Chase Manhattan Bank*, 720 F.Supp. 1080 (S.D.N.Y.1989) in support of the court taking a most stringent view of the efficacy of a Chinese wall. That case, however, involved a situation where the counsel disqualified breached the Canons of Ethics by conferring with the adversary on the case for an hour and a half in the course of which he obtained confidential information and disparaged opposing counsel. In response to a motion for disqualification, counsel argued that it had purged any infection from the admittedly improper action by isolating the lawyers involved and had assured through a Chinese wall that the improper communication would not reach new counsel. The court held, however, that the Chinese wall was ineffective, in substantial part at least, because the disparagement of counsel could not be cured simply by protecting confidences.

This case involves nothing of the sort. There is no indication of wrongdoing; quite the contrary. The New Firm did not abandon an old client to take on a new one. Plaintiffs' representation was committed long before the merger. The New Firm has made a bona fide attempt to reconcile the needs of its present client with its obligations to protect the confidences of its prior representation of the Debtor.

Nothing in the Canons requires that the New Firm abandon the plaintiffs because the Debtor would have them erect their Chinese wall with more formality. In a letter from Mr. Gardner to Mr. McIntyre, Debtor's attorney, dated April 20, 1990

some 20 days after the merger, Mr. Gardner described in detail the steps taken to isolate the representation of plaintiffs from the former representation of the Debtor. Debtor's response to this letter was not to suggest any mechanisms for better protecting confidences of the Debtor. It was and is an effort to seize upon the fact of that former representation as grounds for disqualifying plaintiffs' counsel. It is clear that this disqualification effort was launched as a litigation tactic and that any concern with the Debtor's confidences was secondary. Therefore, Debtor's motion to disqualify plaintiffs' counsel is denied in conformity with this opinion and the attached order.