LaSALLE NATIONAL BANK and Lake Properties Venture, Plaintiffs-Appellants,

v.

COUNTY OF LAKE and the Village of Grayslake, Defendants-Appellees.

No. 82–1601.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 3, 1982.

Decided March 24, 1983.

Don E. Glickman, Rudnick & Wolfe, Chicago, Ill., for plaintiffs-appellants.

Clifford L. Weaver, Chicago, Ill., for defendants-appellees.

Before PELL and CUDAHY, Circuit Judges, and BONSAL,* Senior District Judge.

CUDAHY, Circuit Judge.

This case confronts us with some of the ethical problems involved when a former government attorney takes up the practice of law with a large law firm. Lake County, Illinois, one of the parties to this appeal, is the former employer of an attorney now practicing law with the firm representing the plaintiffs-appellants. Lake County moved to disqualify the plaintiffs' law firm because of the County's former relationship with one of the firm's associates. The district court granted the motion, finding that the past association gave rise to an appearance of impropriety and holding that both the attorney and the entire law firm must be disqualified. Plaintiffs are here appealing the disqualification as a collateral order appealable under the doctrine set forth in *Cohen v. Beneficial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). We affirm the order of the district court.

### I.

Marc Seidler, the attorney upon whose career our attention must focus in this case, served as an Assistant State's Attorney in Lake County from 1976 until January 31, 1981. On December 1, 1976, Mr. Seidler was appointed Chief of the Civil Division of the Lake County State's Attorney's office, and in September 1979, he was appointed First Assistant State's Attorney. As such, he had general supervisory responsibility

* The Honorable Dudley B. Bonsal, Senior District Judge of the United States District Court for the Southern District of New York, is sitting by designation.

with respect to all civil cases handled by the State's Attorney's office. On February 2, 1981, Mr. Seidler joined the Chicago law firm of Rudnick & Wolfe as an associate, working in the firm's Northbrook, Illinois office.

On June 5, 1981, Rudnick & Wolfe filed suit against the County of Lake and the Village of Grayslake, on behalf of its clients, the LaSalle National Bank as Trustee ("LaSalle National") and Lake Properties Venture ("Lake Properties"). LaSalle National and Lake Properties are the owners of a tract of land, known as Heartland, located in the Village of Round Lake Park, an Illinois municipal corporation situated in Lake County. Rudnick & Wolfe has represented these two clients since January 1976 [1] in connection with plans to develop the Heartland property as a mixed-use, low-density development. This representation has included all legal work necessary for implementing the development, including the assembling of parcels of land, annexation, zoning, land planning and obtaining utility services. After failing in a 1979 attempt to secure annexation of the Heartland property to the Village of Grayslake, the plaintiffs negotiated annexation of the property by the Village of Round Lake Park, a process which was completed on January 9, 1981. The plaintiffs allege that on the date of the annexation, they were already planning a law suit to challenge the probable denial by the Village of Grayslake of their request for access to the County's interceptor sewer system. The complaint filed on June 5, 1981 charged that the defendants' refusal to permit access to a federally funded sewer system was arbitrary and capricious and violated plaintiffs' rights to substantive and procedural due process, equal protection and just compensation. It also alleged that the Sewage Disposal Agreement or "sphere of influence agreement" ("the Agreement") under which Lake county permitted the Village of Grayslake to determine whether plaintiffs' property, located in Round Lake Park, would receive sewer services from the Lake County sewer system was an unlawful delegation of authority to Grayslake, an unlawful exercise of extraterritorial jurisdiction by Grayslake and a violation of the terms of the sphere of influence agreement itself.

The Lake County-Grayslake Sewage Disposal Agreement was signed prior to Mr. Seidler's association with the State's Attorney's office, and he was not involved in consideration of the validity or impact of the Agreement upon the Heartland property in particular. However, the Lake County-Grayslake Agreement was one of several similar agreements executed between the County and various municipalities. Mr. Seidler was, moreover, in charge of the Civil Division in a relatively small legal department [2] during the period when the Grayslake Agreement was in effect and was privy to discussions about the validity of such sewage agreements in general. Specifically, it is alleged that Mr. Seidler had access to various documents and memoranda, in particular an opinion letter about the validity of the Agreement prepared by bond counsel for the County and a memorandum expressing the views of one County Board member on the Agreement. Some of these documents were subsequently made public. When County officials requested that the State's Attorney's office prepare a formal legal opinion about the Agreement, Seidler was assigned responsibility for its preparation. The request was subsequently withdrawn and the opinion never written, but Seidler did review the relevant documents in preparation for writing it. He was also involved in consideration of the validity of similar agreements in relation to sewer service for property other than Heartland and participated in discussion about, and the formulation of legal strategies concerning, those agreements. On the basis of Seidler's involvement in these matters, the County

---

1. Herbert L. Nudelman, now a senior partner at Rudnick & Wolfe, had represented LaSalle National and Lake Properties in relation to the Heartland property since 1972 and brought the clients with him to Rudnick & Wolfe when he joined the firm in 1976.

2. There are six attorneys in the Civil Division of the Lake County State's Attorney's office.

moved to disqualify both Seidler and the entire Rudnick & Wolfe firm.

Mr. Seidler has submitted a sworn affidavit stating that he has not disclosed to his law firm or any of its personnel any information about the Agreement, about the County's legal strategy or about any other matter relevant to the present litigation. In addition, Theodore J. Novak, a partner at Rudnick & Wolfe involved in the representation of Lake Properties, has filed an affidavit swearing that Mr. Seidler had been screened from all involvement in the litigation since the motion to disqualify was filed.

## II.

■ Appellees have brought a threshold challenge to our jurisdiction, arguing, in reliance upon *Firestone Tire & Rubber Co. v. Risjord,* 449 U.S. 368, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981), which held that an order denying a motion to disqualify was not a final judgment appealable under the collateral order doctrine of *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), that an order *granting* a motion to disqualify is similarly not appealable. In a recent decision, however, this court held that an order granting a motion to disqualify counsel is covered by the *Cohen* exception to the final judgment rule. *Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715, 720 (7th Cir.1982). The *Freeman* case is dispositive of this challenge, and we properly assert jurisdiction to reach the merits of this case. We will therefore consider, first, whether the district court abused its discretion in holding that Mr. Seidler must be disqualified, and second, whether, if he was properly disqualified, the law firm of Rudnick & Wolfe must also be disqualified from representing the plaintiffs in its suit against Mr. Seidler's former employer.

## III.

■ The standard for disqualification of an attorney who undertakes litigation against a former client is the so-called "substantial relationship" test adopted by this circuit when it affirmed the relevant portion of the district court decision in *Cannon v. U.S. Acoustics Corp.,* 398 F.Supp. 209, 223, *aff'd in part and rev'd in part,* 532 F.2d 1118 (1976). In *Cannon,* the district court adopted the substantial relationship test developed in *T.C. Theatre Corp. v. Warner Bros. Pictures,* 113 F.Supp. 265 (S.D.N.Y. 1953), to give judicial content to the obligations imposed upon attorneys by the professional canons governing their conduct. The test has been described by this circuit as embodying the substance of Canon 4 of the A.B.A. Code of Professional Responsibility, which protects the confidences of a client against disclosure and possible use against him, and of Canon 9, which provides that an attorney must avoid even the appearance of impropriety. Thus, the question before a district court considering a motion for disqualification is "whether it could reasonably be said that during the former representation the attorney might have acquired information related to the subject matter of the subsequent representation." *Cannon,* 398 F.Supp. at 223. If a substantial relationship is found, it is unnecessary for the movant to prove that the attorney in question actually received during the course of his former employment confidential information relevant to matters involved in the subsequent representation. *Schloetter v. Railoc of Indiana, Inc.,* 546 F.2d 706, 710 (7th Cir.1976). The question before us in this case, therefore, is not whether Marc Seidler *received* any specific information relevant to the present litigation during his tenure at the Lake County State's Attorney's office, but solely whether there is a substantial relationship between the subject matter of the prior and present representation.

■ Our most recent cases direct that a three-level inquiry be undertaken in order to determine if such a substantial relationship exists. First, the trial judge must make a factual reconstruction of the scope of the prior legal representation. Second, it must be determined whether it is reasonable to infer that the confidential information allegedly given would have been given

to a lawyer representing a client in those matters. Third, it must be determined whether that information is relevant to the issues raised in the litigation pending against the former client. *Westinghouse Electric Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 225 (7th Cir.1978); *Novo Terapeutisk Laboratorium v. Baxter Travenol Labs, Inc.*, 607 F.2d 186, 195 (7th Cir.1979) (en banc). If, after evaluating the facts of this case according to this three-part standard, we find that such a substantial relationship did exist, we are entitled to presume that the attorney received confidential information during his prior representation. *Schloetter*, 546 F.2d at 710. This presumption, however, is a rebuttable one. *Novo Terapeutisk*, 607 F.2d at 197; *Freeman*, 689 F.2d at 722. Thus, if the first step of our analysis reveals a substantial relationship, we must still proceed to inquire whether the presumption of receipt of confidential information has been adequately rebutted in this case. *Freeman*, 689 F.2d at 723. Further, with respect to all these determinations, we must accept the conclusions of the district court unless we find that there has been an abuse of discretion.

### A.

■ The transcript of the proceedings held before Judge Grady on December 21, 1981 reveals that the relevant legal standards were fully presented to the trial court and that the *Westinghouse* standard was applied to the facts of this case. As to the first prong of the substantial relationship test, we find that the record adequately establishes a factual reconstruction of the scope of Mr. Seidler's prior representation. Seidler contends that the scope of that prior representation did not include the subject of the present litigation because he was not substantially involved in the particular matter at issue—the application of the Lake County-Grayslake Agreement to the Heartland property. However, Seidler ˙was the County's principal legal advisor with respect to all civil matters, supervising an office with only six attorneys in it. Although he may not have been involved in the precise subject of this litigation, he was clearly privy to a substantial amount of discussion and strategic thinking about the various sewage agreements negotiated and signed by Lake County with various municipalities over a period of time when the validity of such agreements was being challenged. The validity of one of those substantially identical agreements is the subject of a broad-based challenge in the lawsuit at hand. We therefore find that the district court did not abuse its discretion in concluding that the subject matter of the present litigation fell within the scope of Mr. Seidler's previous representation.

Applying the second prong of the *Westinghouse* test, we find that it is reasonable to infer that confidential information about the County's legal analysis and strategies relating to the validity of the various sewage agreements would have been given to an attorney who was the chief of the civil division of the State's Attorney's office during that time. In fact, the record contains uncontroverted evidence that Mr. Seidler's advice was sought on the very Agreement in question in the present litigation. He does not deny, moreover, that he was substantially involved in representation of the County regarding the sewage agreements signed with other municipalities or applied to other parcels of land. His own affidavits and the evidence of memoranda contained within his files at the State's Attorney's office make clear that he received a great deal of information about the Grayslake Agreement. The substantial relationship standard does not require that a party moving to disqualify point to or reveal a particular piece of confidential information which the attorney challenged actually received; its receipt will be presumed in circumstances which make it a likely possibility. *Schloetter*, 546 F.2d at 710. We therefore hold that the district court did not abuse its discretion in finding that it was reasonable to infer that confidential information about these matters would have been given to an attorney in Mr. Seidler's former position.

Applying the third prong of the *Westinghouse* test, we have no difficulty finding that information about the validity of the

various sewage agreements signed by Lake County is relevant to the issues raised in the litigation now pending against the County. A simple reading of the complaint filed in this case makes clear that any and all information about Lake County's refusal to permit plaintiffs access to the sewer system in question will be relevant in the pending litigation. Mr. Seidler not only had information about the Agreement challenged here but would presumably be a likely person, as principal legal advisor to the County on civil matters, to have knowledge about the County's attitude or policy toward the extension of sewer services in general. We therefore hold that the district court did not abuse its discretion in concluding that the information presumed to have been possessed by Mr. Seidler was relevant to the issues raised in the litigation now pending against his former employer and, in sum, that the subjects of his past and present representation were substantially related.

### B.

■ Having concluded that the three-part *Westinghouse* test was properly applied and that a substantial relationship existed between the subjects of the past and present representation, we are entitled to presume that confidential information was received during the prior representation, but must still decide whether that presumption has been rebutted on the facts of this case. *Freeman,* 689 F.2d at 723. A very strict standard of proof must be applied to the rebuttal of this presumption, however; and any doubts as to the existence of an asserted conflict of interest must be resolved in favor of disqualification. *Westinghouse Electric Corp. v. Gulf Oil Corp.,* 588 F.2d at 225. If the attorney can clearly and persuasively show that he was not privy to the confidences and secrets of the client, a court will not be held to have abused its discretion in concluding that disqualification is unnecessary; in making this decision a court may consider a number of factors, including *inter alia,* the size of the attorney's law firm, area of specialization of the attorney and his position within the firm. *Freeman,* 689 F.2d at 723.

In the case at hand, Mr. Seidler submitted an affidavit that he had received no information specific to the Grayslake Agreement or to application of the Agreement to the Heartland property. However, after considering the pleadings in this case, we have decided that information relating to *any* of the similar sewage agreements or to the attitude or policies of Lake County toward provision of sewer service in general to new developments is relevant to the issues in the present litigation. Mr. Seidler does not deny that he was privy to information about these other matters. Moreover, considering the small size of the State's Attorney's office and Mr. Seidler's position as supervisor of all the civil legal work there, we cannot say that the presumption raised by the substantial relationship test has been clearly and persuasively rebutted. Since we are required to resolve any doubts in favor of disqualification, we therefore hold that the district court did not abuse its discretion by disqualifying Marc Seidler from representing the plaintiffs in this litigation.

### IV.

■ Having found that Mr. Seidler was properly disqualified from representation of the plaintiffs in this case, we must now address whether this disqualification should be extended to the entire law firm of Rudnick & Wolfe. Although the knowledge possessed by one attorney in a law firm is presumed to be shared with the other attorneys in the firm, *Schloetter,* 546 F.2d at 710–11, this court has held that this presumption may be rebutted. *Novo Terapeutisk,* 607 F.2d at 197. The question arises here whether this presumption may be effectively rebutted by establishing that the "infected" attorney was "screened," or insulated, from all participation in and information about a case, thus avoiding disqualification of an entire law firm based on the prior employment of one member.

Although this court has rejected screening in a situation involving simultaneous

representation of adverse interests by different offices of a large law firm, *Westinghouse Electric Corp. v. Kerr-McGee Corp.,* 580 F.2d 1311, 1321 (7th Cir.1978), it has never directly confronted this issue in a situation such as that presented here. Other circuits, however, have begun to address the problems which arise when attorneys leaving government service join large law firms. If past employment in government results in the disqualification of future employers from representing some of their long-term clients, it seems clearly possible that government attorneys will be regarded as "Typhoid Marys." Many talented lawyers, in turn, may be unwilling to spend a period in government service, if that service makes them unattractive or risky for large law firms to hire. In recognition of this problem, several other circuits have begun either explicitly or implicitly to approve the use of screening as a means to avoid disqualification of an entire law firm by "infection." The Second Circuit has expressed its approval of the use of screening in a situation where the law firm's continued representation of a client results in no threat of a taint to the trial process. *Armstrong v. McAlpin,* 625 F.2d 433, 445 (2d Cir.1980) (en banc), *vacated on other grounds,* 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981). The Fourth Circuit, similarly, has approved an arrangement under which a former Justice Department attorney's new employer was not disqualified, on the basis that the disqualified individual was denied access to all the relevant files and did not participate in fees from the barred litigation. *Greitzer & Locks v. Johns-Manville Corp.,* No. 81–1379, slip op. at 7 (4th Cir. Mar. 5, 1982). Similarly, the Court of Claims has held that a former government attorney's entire firm need not be disqualified where screening procedures insure that he did not consult with the other attorneys about the case or share in fees derived from it. *Kesselhaut v. United States,* 555 F.2d 791 (Ct.Cl.1977).

In 1975 the Committee on Ethics and Professional Responsibility of the American Bar Association turned its attention to the acceptability of screening in its Formal Opinion No. 342. The specific question under consideration was whether Disciplinary Rule 5–105(D) ("If a lawyer is required to decline employment or to withdraw from employment under a disciplinary rule, no partner, or associate, or any other lawyer affiliated with him or his firm, may accept or continue such employment") applied in the case of the many former government attorneys now in private practice. The Committee stated that it did not interpret DR 5–105(D) to require disqualification of an entire law firm if the former government attorney had been screened from any direct or indirect participation in the matter. ABA, Comm. on Ethics and Professional Responsibility, Formal Op. 342 (1975) at 11. The Illinois State Bar Association has taken a similar approach in its Professional Ethics Opinion No. 762, specifically in relation to former Assistant State's Attorneys, holding that the other attorneys in the law firm which such an attorney had joined were not automatically disqualified from litigation in which the former Assistant State's Attorney had participated, so long as the former government attorney did "not work on such matters in any way for his law firm or otherwise use any knowledge he gained for the benefit of the firm." ISBA, Professional Ethics Op. 762 (1982). *Cf.* ISBA, Professional Ethics Op. 811 (1982).

Scholarly commentary has also generally approved screening as a device to avoid the wholesale disqualification of law firms with which former government attorneys are associated. *See, e.g.,* Comment, *Disqualification of Counsel: Adverse Interests and Revolving Doors,* 81 Colum.L.Rev. 199 (1981); Comment, *Ethical Problems for the Law Firm of a Former Government Attorney: Firm or Individual Disqualification?,* 1977 Duke L.J. 512; Liebman, *The Changing Law of Disqualification: The Role of Presumption and Policy,* 73 Nw.U.L.Rev. 996 (1979); Comment, *The Future of the Chinese Wall Defense to Vicarious Disqualification of a Former Government Attorney's Law Firm,* 38 Wash. & Lee L.Rev. 151 (1981).

The screening arrangements which courts and commentators have approved, however, contain certain common characteristics. The attorney involved in the *Armstrong v. McAlpin* case, for example, was denied access to relevant files and did not share in the profits or fees derived from the representation in question; discussion of the suit was prohibited in his presence and no members of the firm were permitted to show him any documents relating to the case; and both the disqualified attorney and others in his firm affirmed these facts under oath. 625 F.2d at 442–43. The screening approved in the *Kesselhaut* case was similarly specific: all other attorneys in the firm were forbidden to discuss the case with the disqualified attorney and instructed to prevent any documents from reaching him; the files were kept in a locked file cabinet, with the keys controlled by two partners and issued to others only on a "need to know" basis. 555 F.2d at 793. In both cases, moreover, as well as in *Greitzer & Locks,* the screening arrangement was set up at the time when the potentially disqualifying event occurred, either when the attorney first joined the firm or when the firm accepted a case presenting an ethical problem.

In the case at hand, by contrast, Mr. Seidler joined the firm of Rudnick & Wolfe on February 2, 1981; yet screening arrangements were not established until the disqualification motion was filed in August 1981. *See* Inter-Office Memorandum, August 26, 1981, in Appellant's App. at 28. Although Mr. Seidler states in his affidavit that he did not disclose to any person associated with the firm any information about the validity of the Agreement or the County's strategy on any matter relevant to this litigation, no specific institutional mechanisms were in place to insure that that information was not shared, even if inadvertently, between the months of February and August.[3] Recognizing that this is an area in which the relevant information is singularly within the ken of the party defending against the motion to disqualify and in which the reputation of the bar as a whole is implicated, we hold that the district court did not abuse its discretion in extending the disqualification of Marc Seidler to the entire firm of Rudnick & Wolfe. The district court order is therefore

AFFIRMED.

---

**3.** We, of course, recognize that our analysis frequently requires identification of problems at the time attorneys are hired. In some cases, this may be difficult or even impossible. Nevertheless, we believe that *timely* screening arrangements are essential to the avoidance of firm disqualification.