**SLC LIMITED V, a California limited partnership, Chapter 11 Debtor, Appellant,**

v.

**BRADFORD GROUP WEST, INC., a Utah Corporation, Creditor, Appellee.**

No. 92–C–757A.

United States District Court, D. Utah, C.D.

Nov. 12, 1992.

Paul J. Toscano, Cohne, Rappaport & Segal, Salt Lake City, Utah, for appellant.

Craig L. Taylor, Ray, Quinney & Nebeker, Salt Lake City, Utah, for appellee.

## ORDER DISQUALIFYING CREDITOR BRADFORD'S COUNSEL

ALDON J. ANDERSON, Senior District Judge.

### I. Introduction

This case involves a bankruptcy proceeding in which the debtor has sought to disqualify the law firm which represents a large creditor due to a conflict of interest with an individual attorney of the creditor's law firm. The conflict of interest arose from the individual attorney's representation of the debtor's general partner in prior commercial transactions while the attorney worked at a different law firm.

### II. Facts

The debtor in this case, SLC Limited V ("SLC V"), appeals to this court from an Order of the United States Bankruptcy Court for the District of Utah refusing to disqualify the law firm of Ray, Quinney & Nebeker from representing the Bradford Group West, Inc. ("Bradford"), a creditor, in SLC V's chapter 11 reorganization. Ray, Quinney & Nebeker ("RQN") represented Bradford throughout the bankruptcy proceedings. SLC V has been represented by Cohne, Rappaport & Segal during the chapter 11 reorganization.

The business structure of SLC V, the debtor, is fairly simple. SLC V is a "single asset" real estate limited partnership which owns a commercial complex in Utah known as the "West Towne Center." SLC V's general partner is the Loran Corporation ("Loran"). The sole shareholders and principals of Loran are Irving N. Fisher ("Fisher") and James F. Kern ("Kern").

On January 17, 1986, SLC V executed a promissory note ("Note") in favor of Bradford Group West, Inc. ("Bradford") in the amount of $2,100,000.[1] SLC V secured the Note to Bradford with an assignment of rents. By January of 1991, after several defaults and forbearances, SLC V's obligation under the Note and Trust Deed matured and fell into arrears. Subsequently, on May 7, 1991, SLC V filed a petition under chapter 11 of the United States Bankruptcy Code which was denied. On April 7, 1992, the bankruptcy court issued an order granting Bradford relief from the automatic stay. Bradford conducted a foreclosure sale under its Trust Deed on SLC V's sole real property, West Towne Center. On May 7, 1992, SLC V filed a Notice of Appeal from Order Granting Relief from Stay which is currently pending. Thereafter, on May 8, 1992, SLC V filed a Debtor's Motion to Disqualify Counsel for Creditor against Bradford and its counsel, Ray, Quinney & Nebeker. This appeal addresses the propriety of RQN's continued representation of SLC V.

The alleged conflict of interest arose on April 1, 1992, when Weston L. Harris ("Harris") and three other attorneys, left the law firm of Watkiss & Saperstein to join the Ray, Quinney & Nebeker firm. While practicing at Watkiss & Saperstein, Harris had represented Loran, as well as Fisher and Kern, while renegotiating and restructuring loans with lenders on projects unrelated to SLC V or the West Towne Center. However, Harris had represented Loran with respect to an entity known as SLC IV, which, while involving different real property, concerned Bradford as the lender.[2] In the course of these

---

1. The Note from SLC V to Bradford is a participation loan in which The Dime Savings Bank of New York ("The Dime") owns 87% of the Note and Trust Deed. Bradford owns the remaining 13%. The law firm of Ray, Quinney & Nebeker has represented both Bradford and The Dime throughout the proceedings. Bradford and The Dime possess similar interests for the purposes of the conflict of interest issues raised in this appeal because they are co-owners of the Note.

2. It was also adduced before the bankruptcy court that Harris represented Loran as a general partner in a bankruptcy proceeding of a partnership known as SLC Limited II. However, the SLC Limited II partnership involved different real property and lenders.

representations for Loran and its principals, Harris learned Loran's business strategy, assets, bargaining strengths and weaknesses, as well as other confidential business information.

With respect to SLC V, Harris testified before the bankruptcy court that, upon reviewing his files, he could find "no file, no evidence, [and] no billings that related to SLC V." Since 1991, Harris had not been involved with any SLC V representation. Furthermore, Harris had not discussed the SLC V bankruptcy since the commencement of his employment at RQN, except in the context of this disqualification proceeding.

Upon reviewing the testimony of Harris and other witnesses, the bankruptcy court concluded that, under the Utah Rules of Professional Conduct 1.6, 1.9(b) and 1.10(b), Harris, as well as the former Watkiss & Saperstein attorneys currently practicing at RQN, were disqualified from representing Bradford. The court determined that the confidential information that Harris obtained during prior representations of Loran and its principals was "substantially related" to the contested matters involving SLC V's chapter 11 proceeding. As such, the bankruptcy court reasoned that the entire RQN firm might be disqualified after considering all relevant factors to protect the interests of all of the clients.

The bankruptcy court, citing *Smith v. Whatcott*, 757 F.2d 1098 (10th Cir.1985), determined that "the 10th Circuit has left open the issue as to whether or not a Chinese Wall can be constructed in circumstances where a tainted attorney then obtains employment with a firm." The bankruptcy court held that, because Harris had neither worked on the case nor discussed it while at RQN, it would be appropriate to permit RQN to represent Bradford. As a condition of continued representation, though, the bankruptcy court required that RQN isolate Harris and the other Watkiss & Saperstein attorneys from the SLC V bankruptcy. Additionally, the court required that none of the "tainted" attorneys share in any economic benefit derived from RQN's participation in the SLC V bankruptcy. SLC V appealed the bankruptcy court's order to this court.

### III. Legal Discussion

#### A. Standard of Review

■■■ The Tenth Circuit has recognized that "the control of attorneys' conduct in trial litigation is within the supervisory powers of the trial judge, and his performance in this area is a matter of judicial discretion." *Redd v. Shell Oil Co.*, 518 F.2d 311, 314 (10th Cir.1975). Thus, this court will not disturb the bankruptcy court's factual findings regarding the attorneys' conduct unless no reasonable basis exists to support the bankruptcy court's conclusions. By contrast, the bankruptcy court's conclusions of law are subject to de novo review by this court. *In re Hart*, 923 F.2d 1410, 1411 (10th Cir.1991) (quoting *Hall v. Vance*, 887 F.2d 1041 (10th Cir. 1989)). For the purposes of this appeal, the bankruptcy court's interpretation of existing Tenth Circuit precedent presents a question of law before this court subject to de novo review.

#### B. Imputed Disqualification of the Ray, Quinney & Nebeker Law Firm

The Tenth Circuit has addressed the issue of imputed disqualification of a law firm under Utah Rule of Professional Conduct 1.10(b).[3] *Graham v. Wyeth Lab.*, 906

---

**3.** Utah Rule of Professional Conduct 1.10 provides as follows:

(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rule 1.7, 1.8(c), 1.9 or 2.2.

(b) When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or a substantially factually related matter in which that lawyer has associ-

ated, or a firm with which the lawyer has associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(b) that is material to the matter.

(c) When a lawyer has terminated an association with a firm, the firm is not prohibited from thereafter representing a person with interests materially adverse to those of a client represented by the formerly associated lawyer unless:

F.2d 1419 (10th Cir.1990); *Smith v. Whatcott,* 757 F.2d 1098 (10th Cir.1985).[4] In *Whatcott,* Leon Smith, the plaintiff, engaged the firm of Boyden, Kennedy & Romney ("Boyden") to represent him in a criminal action initiated against him by Provo City for zoning violations. While representing Smith in the context of the criminal action, Mark Anderson, an associate at the Boyden firm, negotiated a settlement for Smith with Provo City. Smith discussed with Anderson the possibility of a civil action against Whatcott, the sellers of the apartment complex. After further consideration, though, Smith decided to hire different counsel for the civil action.

Subsequently, Smith sued the seller, Whatcott, for alleged misrepresentations regarding the occupancy limits of certain apartment buildings which caused the zoning violations. At trial, Smith was awarded damages of $210,000. Whatcott appealed and hired the law firm of Nielson & Senior to represent him during the appellate process. In the meantime, Mark Anderson joined the Nielson & Senior firm. Neither Anderson nor Nielson & Senior were cognizant of any conflicts when Anderson joined the firm. Subsequently, however, both Smith and Clark Nielson recognized Mark Anderson's name on different documents. Though Anderson remained at Nielson & Senior, he did not discuss the case with any member of the firm and his files were separated from the rest of the firm's documents. Nevertheless, the district court disqualified Nielson & Senior from further representation of Smith due to Anderson's conflict of interest.

In considering Smith's appeal, the Tenth Circuit followed essentially a three-prong analysis to determine whether an attorney's prior representations create a sufficient "taint" to disqualify the law firm which subsequently employs that attorney from representing interests in opposition to that client. *Id.* at 1100–01. At the outset, the court noted that the merits of a disqualification "depend on whether a substantial relationship exists between the pending suit and the matter in which the challenged attorney has previously represented the client." *Id.* at 1100 (citations omitted). A "substantial relationship" would be found to exist if the factual circumstances of the two representations were similar or related. *Id.* (citations omitted).

Second, the court found that, if a substantial relationship exists, an irrebuttable presumption arises that the client had revealed facts to the attorney during the prior representation which compel the attorney's disqualification. *Id.; see also Duncan v. Merrill Lynch, Pierce, Fenner & Smith,* 646 F.2d 1020, 1028 (5th Cir.1981) (concluding that the "substantial relationship" forms an irrebuttable presumption of shared client confidences during the prior representation).[5] This presumption derives from the ethical admonition that client confidentiality should be protected from any appearance of impropriety.[6] *Whatcott,* 757 F.2d at 1100.

---

(1) The matter is the same or substantially related to that in which the formerly associated lawyer represented the client; and

(2) Any lawyer remaining in the firm has information protected by Rules 1.6 and 1.9(b) that is material to the matter.

(d) A disqualification prescribed by this Rule may be waived by the affected client under the conditions stated in Rule 1.7.

**4.** For a discussion of different treatments of the "Chinese Wall" issue, *see* Kevin W. Brown, Annotation, *Sufficiency of Screening Measures (Chinese Wall) Designed to Prevent Disqualification of Law Firm, Member of Which is Disqualified for Conflict of Interest,* 68 A.L.R.Fed. 674 (1984).

**5.** This court is aware of an alternate peripheral representation standard which several circuits

have followed. *See Manning v. Waring, Cox, James, Sklar and Allen,* 849 F.2d 222, 224 (6th Cir.1988); *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.,* 518 F.2d 751, 753–57 (2d Cir.1975). These decisions suggest that the presumption of shared client confidences during the prior representation is rebuttable for a number of policy reasons. The Tenth Circuit, however, has explicitly followed the line of reasoning from the Fifth, Seventh and Eighth Circuits that considers the presumption of shared client confidences during the prior representation to be irrebuttable. *See Whatcott,* 757 F.2d at 1100 (citations omitted).

**6.** Since the *Whatcott* decision, Utah has adopted the Utah Rules of Professional Conduct effective January 1, 1988. The "appearance of impropriety" standard was grounded in Canon 9 of

Third, upon divining a substantial relationship between current and prior representations, a second presumption arises that the attorney shared the confidential information with the new firm regarding the prior representation. *Id.* at 1101. If confidential information was shared with members of the new firm, the entire firm would be disqualified. *Id.* Unlike the former presumption, though, the *Whatcott* decision recognized an "exception" to disqualification if the firm demonstrates that the attorney has been "effectively screened from financial interest and participation" in the conflicting representation. *Id.* (citing *LaSalle Nat. Bank v. County of Lake,* 703 F.2d 252 (7th Cir.1983)). The adequacy of the firm's screening procedures are determined by "the size and structural divisions of the law firm involved, the likelihood of contact between the infected attorneys responsible for the present representation, the existence of rules which prevent the 'infected' attorney from access to relevant files or other information pertaining to the present litigation or which prevent him from sharing in the fees derived from such litigation." *Id.* at 1101 (citing *Schiessle v. Stephens,* 717 F.2d 417, 421 (7th Cir.1983)). It is clear, however, that such "specific institutional mechanisms" must be "in place" to block the flow of confidential information at the time the conflict arises between prior and subsequent representations. *Id.* (citing *LaSalle,* 703 F.2d at 259).

In *Whatcott,* the defendants admitted that Anderson's prior representation of Smith was substantially related to the subsequent civil litigation conducted by Nielson & Senior. *Id.* at 1100. Thus, the first presumption regarding Anderson's receipt of confidential information during the prior criminal representation precluded Anderson's participation in the subsequent civil action. *Id.* With respect to the second presumption, the court concluded that, because "no 'specific institutional mechanisms' designed to prevent inadvertent disclosure were in place *when the firm accepted the case,*" the court was not required to determine what types of mechanisms would have prevented the firm's disqualification. *Id.* (emphasis added). Thus, the entire Nielson & Senior firm was disqualified because of the presumption of firmwide disclosure of Smith's confidential client information, despite the firm's submission of affidavits attesting that no information had been disclosed. *Id.* at 1102.

In the present case, the bankruptcy court suggested that the Tenth Circuit had "left open the issue as to whether or not a Chinese Wall can be constructed in circumstances where a tainted attorney then obtains employment with a firm." It is true, to a degree, that the *Whatcott* decision did not specify which types of "institutional screening mechanisms" would satisfy the ethical requirements imposed by Utah Rule of Professional Conduct 1.10(b). On the other hand, the *Whatcott* decision clearly stated that, as a condition precedent to such mechanisms' effectiveness, they must be "in place" when the conflict arises. *Id.* at 1101.

■ Additionally, the Seventh Circuit's *LaSalle* and *Schiessle* decisions, relied upon by the Tenth Circuit, articulate an identical requirement that the screening mechanisms be established when the con-

the former Utah Code of Professional Responsibility. Following the adoption of the Rules of Professional Conduct, the "appearance of impropriety" standard has been criticized as a basis for attorney disqualification. *Bodily v. Intermountain Health Care Corp.,* 649 F.Supp. 468, 476–77 (D.Utah 1986); *but see First American Carriers, Inc. v. Kroger Co.,* 302 Ark. 86, 787 S.W.2d 669, 672 (1990) (applying appearance of impropriety standard under the Model Rules of Professional Conduct). In fact, the official comment to Utah Rule of Professional Conduct 1.10 suggests that the "appearance of impropriety" standard is question-begging because the term "impropriety" remains undefined in the Code of Professional Responsibility. Thus, "the problem of imputed disqualification cannot be properly resolved either by simple analogy or by the very general concept of appearance of impropriety." Utah Rule of Professional Responsibility 1.10 cmt. (1992). In assessing the issues currently before it, this court will attempt to avoid the circular use of the term "appearance of impropriety." *See generally,* Mark F. Anderson, *Motions to Disqualify Opposing Counsel,* 30 Washburn L.J. 238, 253 n. 99 (1991) (discussing differences between Canon 9 and Model Rule 1.10(b) standards for imputed disqualification).

flict arises. *Id.* (citations omitted). Other circuits have instituted similar requirements. *See, e.g., EZ Paintr Corp. v. Padco, Inc.,* 746 F.2d 1459, 1462 (Fed.Cir.1984) (disqualifying law firm when screening procedures not created until three months after attorney joined firm); *Haagen–Dazs Co. v. Perche No! Gelato, Inc.,* 639 F.Supp. 282, 287 (N.D.Cal.1986) (disqualifying law firm when screening procedures not established until one year after attorney joined firm); *In re Asbestos Cases,* 514 F.Supp. 914, 922–25 (E.D.Va.1981) (disqualifying law firm, in part, because screening mechanisms were established after tainted attorney had joined firm). Indeed, the *LaSalle* court noted that proper screening arrangements should be "set up at the time when the potentially disqualifying event occurred, either when the attorney first joined the firm or when the firm accepted a case presenting an ethical problem." *LaSalle,* 703 F.2d at 259; *see also Geisler ex rel. Geisler v. Wyeth Lab.,* 716 F.Supp. 520, 526 (D.Kan.1989) ("[A] law firm must have had in place, at the time of hiring the conflicted attorney, firm-wide policies promulgated to prevent the inadvertent flow of confidential information."). In short, it is insufficient to remedy a conflict of interest by building a "Chinese Wall" to screen a "tainted" attorney after the potential for improper disclosure has existed. Once Pandora's Box has been opened, the ethical malaise which may have escaped cannot be treated by nailing a plank over the open vessel.

■ With respect to RQN's representation of Bradford, the bankruptcy court determined that because of Harris's significant legal representation of Loran, as well as its principals, the information obtained by Harris was "substantially related" to the contested matter regarding the automatic stay. Specifically, the information related to Loran's financial strengths and weaknesses, as well as its ability to restructure the Note and Deed of Trust with Bradford. Thus, the circumstances surrounding the prior representations of Loran, Kern and Fisher were factually similar to the issues involved in the contested matter regarding the automatic stay. Because

the factual circumstances between the prior and current representations were "substantially related," the first presumption arises that confidential information was shared between Loran, Fisher, Kern and Harris. This presumption is irrebuttable.

■ On appeal to this court, Bradford argues that "[t]here was no conflict when Ray, Quinney & Nebeker accepted this case." Rather, the conflict arose because of the bankruptcy court's determination that Harris's prior representations of Loran were "substantially related" to the SLC V bankruptcy. Thus, according to Bradford's reasoning, "the conflict here is in the nature of an indirect conflict not readily apparent when Harris joined Ray, Quinney & Nebeker." This argument, however, posits a notion of "conflict of interest" which has not been accepted by courts considering this problem. In fact, the *LaSalle* court expressly stated that proper screening arrangements should be established when the potentially disqualifying event occurred, either when the attorney initially joined the firm or when the firm accepted a case presenting an ethical issue. *LaSalle,* 703 F.2d at 259. In other words, the "potentially disqualifying event" serves as the touchstone for when a conflict of interest may arise for imputed disqualification purposes, rather than a court's subsequent determination that a conflict of interest exists. A potentially disqualifying event may arise whenever the current and prior representations are "substantially related," or share similar factual circumstances. Nevertheless, in considering this appeal, this court presumes that the bankruptcy court correctly concluded that Harris knew confidential information regarding Loran and its principals when he moved to RQN.

■ Finally, at the heart of this dispute, the second presumption regarding the flow of confidential information from Harris to other attorneys at RQN arises. Unlike the prior presumption, Harris and RQN may rebut this presumption by tendering evidence indicating that no confidential information was revealed because insti-

tutional screening mechanisms prevented its disclosure at the time he joined RQN.

Harris and the other Watkiss & Saperstein attorneys arrived at RQN on April 1, 1992. RQN represented Bradford through SLC V's bankruptcy since May 7, 1991. Despite RQN's representation of Bradford prior to Harris's employment with the firm, the bankruptcy court found that Harris did not discuss the case with anyone at the RQN firm, except in the context of this Debtor's Motion to Disqualify Counsel for Creditor. Additionally, the bankruptcy court determined that Harris had not represented Loran in any capacity since 1991. Lastly, the court concluded that Harris's files regarding Loran and its principals were in storage and Harris had no "active memory" concerning SLC V. Given Harris' testimony, the bankruptcy court reasoned that, while Harris would be disqualified, it would be appropriate *not* to disqualify RQN. Instead of disqualifying RQN, the bankruptcy judge required RQN to establish screening mechanisms to prevent the inadvertent disclosure of information regarding the SLC V proceeding. Moreover, the bankruptcy court required that Harris be precluded from sharing in any economic benefit resulting from RQN's representation of SLC V.

On appeal, Bradford argues that, if RQN demonstrates that Harris disclosed no client confidences while at RQN, the second presumption of shared confidences will be rebutted and RQN should not be disqualified. Bradford relies upon *Manning v. Waring, Cox, James, Sklar and Allen,* 849 F.2d 222, 227 (6th Cir.1988), for the principle that screening procedures may be established *after* the discovery of the conflict of interest if the law firm and "tainted" attorney show that no client confidences were divulged. Bradford contends that such a position avoids a "bright-line" test and examines the potential conflict of interest from a "totality of the circumstances" perspective. This approach, while suggested in dicta by the *Manning* decision, has not been adopted in other circuits considering the issue. *See, e.g., Whatcott,* 757 F.2d at 1101 (requiring that screening procedures be "in place" when the conflict arises) (citations omitted).

In fact, the bright-line requirement for establishing screening mechanisms contemporaneously with a new attorney's arrival serves several important policies. First, as a practical matter, information is shared frequently through informal channels at law firms, often outside the office environment. The potential for disclosure, even though inadvertent, is significant. Second, the pecuniary and strategic value of the information shared through client confidences presents an unseemly economic incentive for abuse without protective screening devices. Lastly, it is simply undesirable to require an opposing party to accept the self-serving assurance of a former attorney that he or she has not divulged valuable information prior to the construction of screening arrangements. *See generally* Thomas D. Morgan, *Screening the Disqualified Lawyer: The Wrong Solution to the Wrong Problem,* U.Ark. Little Rock L.J. 37, 48–49 (1987–88) (discussing difficulties with screening mechanisms). The bright-line requirement that institutional mechanisms be implemented prior to a "tainted" attorney's arrival at a law firm alleviates many of these ethical concerns. Additionally, such a requirement shifts the burden of preventing imputed disqualification to the parties in the best position to prevent inadvertent disclosure. Both the "tainted" attorney and the new law firm should require thorough scrutiny of current client lists and prior representations to prevent a potentially disqualifying event from arising.

Under Tenth Circuit decisions, as well as the decisions relied upon from other circuits, the institutional screening mechanisms which prevent the flow of confidential client information must be established prior to the arrival of the "conflicted" attorney. *Whatcott,* 757 F.2d at 1101 (citations omitted). Neither RQN nor Harris produced any evidence before the bankruptcy court indicating that RQN instituted screening mechanisms prior to Harris' arrival at the firm. In fact, upon learning that Harris represented Loran and its principals in prior matters, RQN failed to construct screening mechanisms while continuing to represent Bradford in SLC V's chap-

ter 11 proceedings. It is simply insufficient to rely upon RQN's assertions that Harris has not discussed the SLC V case with anyone at the RQN firm. Both Utah Rule of Professional Conduct 1.10(b), and Tenth Circuit decisions addressing imputed disqualification, require more from RQN than assurances of nondisclosure. Rather, RQN needed to demonstrate that specific institutional screening mechanisms were constructed, or in place, at the time Harris joined the firm on April 1, 1992. RQN failed to satisfy this requirement.

## IV. Decision

The bankruptcy court's order is reversed with regard to the disqualification of RQN. The bankruptcy court erred by allowing RQN to establish a wall of separation between Harris and the RQN firm because the conflict of interest, and appurtenant "appearances of impropriety," existed at the time Harris moved his legal practice to RQN. It was, therefore, inappropriate to permit RQN to construct screening devices several months after Harris arrived at the firm. After examining the relevant facts and law, this court concludes that RQN should be disqualified from further representation of Bradford and The Dime Savings Bank of New York in SLC V's chapter 11 reorganization proceedings.

IT IS SO ORDERED.