RYAN'S EXPRESS TRANSPORTATION SERVICES, INC., A NEVADA CORPORATION, APPELLANT, v. AMADOR STAGE LINES, INC., A FOREIGN CORPORATION, RESPONDENT.

No. 56570

June 14, 2012                                        279 P.3d 166

_____

*Gibbs, Giden, Locher, Turner & Senet, LLP*, and *Becky A. Pintar* and *Airene Haze*, Las Vegas, for Appellant.

*Woodburn and Wedge* and *Ellen Jean Winograd*, Reno, for Respondent.

# OPINION

By the Court, DOUGLAS, J.:

Although the Nevada Rules of Professional Conduct (RPC) permit the screening of disqualified attorneys to prevent an associated law firm's imputed disqualification in some cases, RPC 1.10(e); 1.11(b); 1.12(c), we have never considered whether screening is appropriate with regard to a settlement judge acting under this court's settlement conference program or how to determine the sufficiency of any screening measures utilized. We take this opportunity to consider the practice of attorney screening to cure imputed disqualification.

The parties agree that supreme court settlement judge Nicholas Frey is disqualified from representing respondent Amador Stage Lines, Inc., in the present matter. Pursuant to RPC 1.12(c), Frey's disqualification is imputed to the remaining members of his law firm, Woodburn and Wedge, but the parties disagree on whether screening may be utilized to cure the imputed disqualification. In order to resolve appellant Ryan's Express Transportation Services, Inc.'s pending motion to disqualify Woodburn and Wedge from representing Amador in this appeal, we must consider whether screening may be used to cure imputed disqualification in this situation and whether the screening measures taken by Woodburn and Wedge are sufficient.

However, because we conclude that more facts are necessary for us to consider the sufficiency of Woodburn and Wedge's screening measures, we defer ruling on the motion to disqualify and remand this matter to the district court for the limited purpose of conducting an evidentiary hearing and entering written findings of fact and conclusions of law regarding the adequacy of the screening.

## FACTS AND PROCEDURAL HISTORY

Ryan's Express appeals from a district court's order dismissing its claims against Amador, and the appeal was assigned to this court's settlement program. *See* NRAP 16. Frey, a shareholder at the law firm of Woodburn and Wedge, was appointed as the set-

tlement judge. After receiving the parties' confidential settlement statements, Frey held a settlement conference, but the parties were unable to reach an agreement. Thereafter, Amador's counsel of many years, Ellen Jean Winograd, accepted a position as a shareholder at Woodburn and Wedge, and Woodburn and Wedge substituted as counsel for Amador in the instant appeal.

Ryan's Express now moves to disqualify Woodburn and Wedge as Amador's counsel, asserting that a conflict of interest exists based on Frey's involvement in the case as a settlement judge, that the conflict is necessarily imputed to the entire law firm, and that the conflict cannot be cured by any screening measures. Amador admits that Frey is disqualified, but argues that the screening measures Woodburn and Wedge have undertaken are sufficient to cure the conflict, and that Winograd should be allowed to continue representing Amador.

## DISCUSSION

Ryan's Express argues that Woodburn and Wedge must be disqualified from representing Amador in this appeal because Frey participated as a supreme court settlement judge in this matter. Ryan's Express contends that because Frey obtained highly confidential information pertaining to its strategies and factual and legal contentions, Frey must be disqualified and Frey's disqualification must be imputed to all other members of Woodburn and Wedge. Ryan's Express asserts that Frey's conflict of interest is fatal to Woodburn and Wedge's representation of Amador and cannot be cured by screening because RPC 1.10(e)(1) permits screening only where a disqualified lawyer did not have a "substantial role in or primary responsibility for the matter that causes the disqualification." Ryan's Express insists that a law firm that employs a settlement judge who received confidential ex parte information must be disqualified in order to preserve the public trust, and that no screening measures can cure this disqualification. Furthermore, Ryan's Express argues that the interest of preventing public suspicion of the settlement program outweighs the interest of Amador's right to counsel of choice.

Amador, however, argues that disqualification of the entire firm is unnecessary and unwarranted. Amador contends that (1) Frey is an attorney and a supreme court settlement judge of the highest caliber and integrity, and that he would never compromise the settlement program; (2) disqualification of the firm would impose substantial hardship in Amador's opposition to the pending appeal because it would lose the services of its original counsel; (3) the applicable rule of professional conduct is RPC 1.12, which expressly permits the screening of mediators, arbitrators, and former judges to prevent imputed disqualification; and (4) Woodburn and

Wedge has gone to extensive lengths to screen Frey from the present appeal.

*Background*

This court and other courts have long recognized that it is within the inherent power of the court to govern the conduct of the members of the bar appearing before it. *State Bar of Nevada v. Claiborne*, 104 Nev. 115, 126, 756 P.2d 464, 471 (1988); *see, e.g.*, *State ex rel. NSBA v. Krepela*, 610 N.W.2d 1, 3 (Neb. 2000); *Beyers v. Richmond*, 937 A.2d 1082, 1091 (Pa. 2007); *Swafford v. Harris*, 967 S.W.2d 319, 321 (Tenn. 1998). Similar to the principles governing attorney-client relationships and judicial conduct, settlement judges in this court's settlement program are under a duty of confidentiality and a duty to avoid conflicts of interest. *In the Matter of the Adoption of Rule 16 of the Nevada Rules of Appellate Procedure Governing Settlement Conferences in Civil Appeals*, ADKT 244 (Order Adopting Code of Conduct for Supreme Court Settlement Judges, March 10, 2006) [hereinafter, Code of Conduct for Supreme Court Settlement Judges]. Similar to an attorney-client relationship, parties coming before a settlement judge must have the "utmost confidence" that confidential information disclosed to the settlement judge will remain confidential. *Compare* RPC 1.6 *with* Code of Conduct for Supreme Court Settlement Judges, *supra*, Standard V (employing language similar to Nevada Rules of Professional Conduct and requiring settlement judges to maintain the confidentiality of all information learned from mediation and private sessions). These duties of confidentiality and avoidance of conflicts of interest persist even after the termination of the settlement proceedings. Code of Conduct for Supreme Court Settlement Judges, *supra*, Standard III(G). Settlement judges, like attorneys and judges, also have an obligation to avoid even the appearance of impropriety. *Id.* Standard III(A), (G); Revised Nevada Code of Judicial Conduct Canon 1; *Collier v. Legakes*, 98 Nev. 307, 310, 646 P.2d 1219, 1220-21 (1982).

In this case, the parties agree that Frey is disqualified.[1] As the settlement judge for this appeal, Frey "participated personally and substantially" as a third-party neutral, and unless all parties give informed consent in writing, RPC 1.12(a), he may not represent

---

[1]We note that although Ryan's Express argues that RPC 1.10 is applicable, this is incorrect. Instead, this motion is governed by RPC 1.12. While RPC 1.10 governs the imputation of disqualifications generally, RPC 1.12 specifically governs conflicts of interest relating to former judges, arbitrators, mediators, and other third-party neutrals. Therefore, we proceed to analyze this motion under RPC 1.12.

anyone in connection with this matter. No such consent was given here. Furthermore, Woodburn and Wedge is necessarily disqualified under RPC 1.12's imputation provision, unless it can demonstrate that Frey was timely and adequately screened pursuant to RPC 1.12(c). Therefore, we turn our attention to the issue of screening.

*Screening may be used to cure imputed disqualification*

The ethical principles and public policy considerations that lead us to impose a presumption of shared confidence[2] and at times disqualify entire law firms, however, do not come without a heavy cost. In applying the rule of imputed disqualification, we restrict the client's right to choice of counsel.[3] *Leibowitz v. Dist. Ct.*, 119 Nev. 523, 532, 78 P.3d 515, 521 (2003). The importance of these competing concerns requires us to carefully balance one client's right to choice of counsel against another client's interest in avoiding disclosure of confidential information.

Here, because the settlement program is court-sponsored, any perceived improprieties will have a potential impact on the public's confidence in the judicial process. A perception that a party opponent could learn confidential information from the presiding settlement judge will also undermine the ability of the settlement program to resolve matters in a quick, cost-effective, and satisfactory manner. Parties will be less willing to share confidences when there is a fear that the settlement judge may later take this knowledge to an adversary.

---

[2]A presumption of shared confidence, wherein it is presumed that an attorney takes with him or her any confidences gained in a former relationship and shares them with the firm, is imposed by the imputation provisions of RPC 1.10, 1.11, and 1.12.

[3]The Seventh Circuit Court of Appeals has explained that

> disqualification, as a prophylactic device for protecting the attorney-client relationship, is a drastic measure which courts should hesitate to impose except when absolutely necessary. A disqualification of counsel, while protecting the attorney-client relationship, also serves to destroy a relationship by depriving a party of representation of their own choosing. . . . We do not mean to infer that motions to disqualify counsel may not be legitimate, for there obviously are situations where they are both legitimate and necessary; nonetheless, such motions should be viewed with extreme caution for they can be misused as techniques of harassment.

*Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 721-22 (7th Cir. 1982) (citations omitted); *see also Leibowitz v. Dist. Ct.*, 119 Nev. 523, 532, 78 P.3d 515, 521 (2003) ("Imputed disqualification is considered a harsh remedy that 'should be invoked if, and only if, the [c]ourt is satisfied that real harm is likely to result from failing to invoke it.'" (alteration in original) (quoting *Hayes v. Central States Orthopedic*, 51 P.3d 562, 565 (Okla. 2002))).

On the other hand, an uncompromising rule that strictly requires the disqualification of a law firm associated with a settlement judge is problematic. Such a rule may have an effect of deterring otherwise well-qualified attorneys from seeking appointment as settlement judges. It may also impede the movement of attorneys associated with a settlement judge. Such a rule would potentially restrict a client's choice of counsel needlessly. Lawyers, simply, are not fungible goods. *See Ryan v. Dist. Ct.*, 123 Nev. 419, 427, 168 P.3d 703, 709 (2007); *Bongiovi v. Sullivan*, 122 Nev. 556, 571, 138 P.3d 433, 444 (2006); *see also Robins v. United States*, 404 U.S. 1049, 1052 (1972) (Brennan, J., dissenting); *Carlson v. Jess*, 507 F. Supp. 2d 968, 980 (E.D. Wis. 2007). One lawyer cannot substitute for another lawyer's skills, experience, and other unquantifiable characteristics.

Because of the conflicting public policy and ethical concerns, we hold that the screening of lawyers, under the applicable rules of professional conduct, may be used to rebut the presumption of shared confidences.

## Adequacy of screening measures

Under RPC 1.12(c), the law firm the disqualified lawyer is associated with will not be disqualified if

> (1) The disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom; and
> (2) Written notice is promptly given to the parties and any appropriate tribunal to enable them to ascertain compliance with the provisions of this Rule.

This court has tasked the district court with considering the sufficiency of screening measures instituted in regard to a nonlawyer employee in order to avoid imputed disqualification. *Leibowitz*, 119 Nev. at 533, 78 P.3d at 522. To assist the district court in making this determination, this court went so far as to set forth a list of factors to consider.[4] *Id.* at 534, 78 P.3d at 522. Although we have yet to consider the adequacy of screening measures utilized where

---

[4]We have recognized seven nonexclusive factors when considering the adequacy and timing of screening measures for nonlawyers:

> To determine whether screening has been or may be effective, the district court should consider: (1) "the substantiality of the relationship between the former and current matters," (2) "the time elapsed between the matters," (3) "the size of the firm," (4) "the number of individuals presumed to have confidential information," (5) "the nature of their involvement in the former matter," (6) "the timing and features of any measures taken to reduce the danger of disclosure," and (7) whether the

a lawyer is disqualified pursuant to RPC 1.12, several jurisdictions have considered the adequacy of screening measures utilized in this and similar situations, and each utilizes similar nonexclusive factors in making such a determination on a case-by-case basis. Kevin W. Brown, Annotation, *Sufficiency of Screening Measures (Chinese Wall) Designed to Prevent Disqualification of Law Firm, Member of Which is Disqualified for Conflict of Interest*, 68 A.L.R. Fed. 687 (1984); *see Pappas v. Waggoner's Heating & Air, Inc.*, 108 P.3d 9, 14 (Okla. Civ. App. 2004) (considering the sufficiency of screening mechanisms under the framework of Oklahoma's counterpart to RPC 1.12); *see also Cromley v. Bd. of Educ. of Lockport H. S. D. 205*, 17 F.3d 1059, 1065 (7th Cir. 1994); *Stencel v. Fairchild Corp.*, 174 F. Supp. 2d 1080, 1086 (C.D. Cal. 2001); *Chapman v. Chrysler Corp.*, 54 F. Supp. 2d 864, 866 (S.D. Ind. 1999). Those factors include:

> (1) instructions given to ban the exchange of information between the disqualified attorney and other members of the firm; (2) restricted access to files and other information about the case; (3) prohibited sharing in fees derived from the litigation; (4) the size of the law firm and its structural divisions; and (5) the likelihood of contact between the quarantine lawyer and other members of the firm.

*Pappas*, 108 P.3d at 14. The Court of Appeals for the Seventh Circuit explained that the presumption of shared confidences "could be rebutted by demonstrating that 'specific institutional mechanisms' . . . had been implemented to effectively insulate against any flow of confidential information from the 'infected' attorney to any other member of his present firm." *Schiessle v. Stephens*, 717 F.2d 417, 421 (7th Cir. 1983) (quoting *LaSalle Nat. Bank v. Lake County*, 703 F.2d 252, 259 (7th Cir. 1983)); *see also Manning v. Waring, Cox, James, Sklar and Allen*, 849 F.2d 222, 225 (6th Cir. 1988) (adopting the Seventh Circuit's approach in addressing motions to vicariously disqualify a law firm); *Smith v. Whatcott*, 757 F.2d 1098, 1101-02 (10th Cir. 1985), *superseded by rule on other grounds*, Utah Rules of Professional Conduct 1.10, *as recognized in SLC Ltd. V v. Bradford Group West, Inc.*, 999 F.2d 464, 468 (10th Cir. 1993). However, the Seventh Circuit has also held that the absence of institutional mechanisms[5] to pre-

---

"old firm and the new firm represent adverse parties in the same proceeding, rather than in different proceedings" because inadvertent disclosure by the nonlawyer employee is more likely in the former situation. *Leibowitz*, 119 Nev. at 534, 78 P.3d at 522 (quoting *In re Bell Helicopter Textron, Inc.*, 87 S.W.3d 139, 146 (Tex. App. 2002)).

[5]Such institutional mechanisms have been referred to as "Chinese walls": Chinese Walls are specific institutional mechanisms which prevent contact between the tainted attorney and members of the firm working on the

vent the sharing of information, including inadvertent sharing, would justify disqualification of the new law firm under the imputation rule, even though the disqualified attorney had attested in his affidavit that he did not disclose "any information" about the former client's strategy or legal theories. *LaSalle*, 703 F.2d at 259.

Additionally, the timing of the implementation of screening measures in relation to the occurrence of the disqualifying event is relevant in determining whether the screen was properly erected. *Cf. Leibowitz*, 119 Nev. at 534 (considering the effectiveness of screening measures for nonattorney employees). Furthermore, the screen must be in place when the attorney joins the firm. *Kala v. Aluminum Smelting & Refining Co.*, 688 N.E.2d 258, 267 (Ohio 1998).

Today, we adopt an analysis similar to the approaches taken by the courts discussed above. When presented with a dispute over whether a lawyer has been properly screened, Nevada courts should conduct an evidentiary hearing to determine the adequacy and timeliness of the screening measures on a case-by-case basis. The burden of proof is upon the party seeking to cure an imputed disqualification with screening to demonstrate that the use of screening is appropriate for the situation and that the disqualified attorney is timely and properly screened.

When considering whether the screening measures implemented are adequate, courts are to be guided by the following non-exhaustive list of factors:

> (1) instructions given to ban the exchange of information between the disqualified attorney and other members of the firm;
>
> (2) restricted access to files and other information about the case;
>
> (3) the size of the law firm and its structural divisions;

---

related matter. Such mechanisms may be structural, such as departmentalization, procedural, as in restricting access to files, pecuniary, by denying the tainted attorney any remuneration from fees derived from the representation, or educational, such as providing programs that make firm members aware of the ban on exchange of information. Usually, effective screening procedures involve all of the above components.

Marc I. Steinberg & Timothy U. Sharpe, *Attorney Conflicts of Interest: The Need for a Coherent Framework*, 66 Notre Dame L. Rev. 1, 20 (1990) (quotations and footnotes omitted).

(4) the likelihood of contact between the quarantined lawyer and other members of the firm; and

(5) the timing of the screening.

As with motions to disqualify, the consideration of the adequacy of screening is within the sound discretion of the district court, *LaSalle*, 703 F.2d at 256; however, the district court must justify its determination as to the adequacy of the screening in a written order with specific findings of fact and conclusions of law.

In this case, although Amador's counsel supplied two affidavits to support Woodburn and Wedge's use of a screening device to prevent imputed disqualification, we conclude that an evidentiary hearing is necessary to determine the sufficiency of the screening measures implemented by Woodburn and Wedge.

*This matter is remanded to the district court for an evidentiary hearing on the screening issue*

In Nevada, there is no specific statute or rule that specifically authorizes this court to remand a matter to a district court for additional fact-finding when an issue of fact arises in the first instance before this court. Although we have remanded cases to the district court for additional fact-finding in the past, we have never indicated from where the authority for such procedure is derived. *Zugel v. Miller*, 99 Nev. 100, 659 P.2d 296 (1983); *Pease v. Taylor*, 86 Nev. 195, 467 P.2d 109 (1970); *see also Zobrist v. Sheriff*, 96 Nev. 625, 614 P.2d 538 (1980). We take this opportunity to do so.

An appellate court is not particularly well-suited to make factual determinations in the first instance. *Zugel*, 99 Nev. at 101, 659 P.2d at 297; 16 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3937.1 (2d ed. 1996) ("Appellate procedure is not geared to factfinding."); *see also Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985) (explaining that a trial court is better suited as an original finder of fact because of the trial judge's superior position to make determinations of credibility and experience in making determinations of fact); *Alburquerque v. Bara*, 628 F.2d 767, 775 (2d Cir. 1980) (remanding habeas petition to district court for additional fact findings because Court of Appeals was not well-suited to make factual findings). An appellate court's ability to make factual determinations is hampered by the rules of appellate procedure, the limited

ability to take oral testimony, and its panel or en banc nature. However, an appellate court must have the ability to resolve factual disputes that arise post-appeal.

Other jurisdictions have resolved the difficulty of fact-finding by courts of review by adopting specific rules of appellate procedure. For example, California courts adopted a court rule, appellate rule 8.252, which permits a party to move to have a reviewing court take evidence. An order granting such a motion must:

(A) State the issues on which evidence will be taken;

(B) Specify whether the court, a justice, or a special master or referee will take the evidence; and

(C) Give notice of the time and place for taking the evidence.

*Id.* Similarly, federal courts have adopted Rule 48 of the Federal Rules of Appellate Procedure. FRAP 48 authorizes a court of appeals to appoint a special master "to hold hearings, if necessary, and to recommend factual findings and dispositions in matters ancillary to proceedings in the court." First adopted in 1994, FRAP 48 specifically authorizes the use of masters in instances where a court of appeals is required to make a factual determination. FRAP 48 advisory committee note. The advisory committee explained that although the general and ordinary practice is to remand a case to the district court or agency that originally heard the case when factual issues remain unresolved, the ability to refer a factual issue to a master for a recommendation is useful when a factual issue arises in the first instance before the court of appeals. *Id.* And even before the adoption of FRAP 48, federal courts of appeal long engaged in the practice of using masters to address questions requiring a factual determination. *Id.* (citing *Polish National Alliance v. NLRB*, 159 F.2d 38 (7th Cir. 1946); *NLRB v. Arcade-Sunshine Co.*, 132 F.2d 8 (D.C. Cir. 1942); *NLRB v. Remington Rand, Inc.*, 130 F.2d 919 (2d Cir. 1942)).

Although California courts and federal appellate courts have resolved the difficulty of fact-finding by courts of review by adoption of court rules and appellate procedures, we conclude that the power to order a limited remand to resolve factual issues comes from the inherent power of the courts. By virtue of constitutional existence, this court is vested with inherent authority to accomplish or carry out basic functions of the judiciary. *Halverson v. Hardcastle*, 123 Nev. 245, 261-62, 163 P.3d 428, 440 (2007); *see also Whitlock v. Salmon*, 104 Nev. 24, 26, 752 P.2d 210, 211 (1988). The court's authority encompasses powers " '*reasonable and necessary*' " for the administration of court procedure and management of judicial affairs. *Halverson*, 123 Nev. at 261, 163 P.3d at 440 (quoting *Borger v. Dist. Ct.*, 120 Nev. 1021, 1029, 102 P.3d

600, 606 (2004)). While our inherent authority is not infinite, it should be exercised when established methods fail. *Id.* at 263, 163 P.3d at 441.

Accordingly, we exercise our inherent authority and remand this matter to the district court for an evidentiary hearing to determine the sufficiency of the screening measures adopted by Woodburn and Wedge based on the analysis set forth above. We defer ruling on the motion to disqualify Amador's counsel pending our consideration of the district court's findings of fact and conclusions of law. The district court shall enter such an order within 45 days from the date of this opinion, and the district court clerk shall immediately thereafter transmit a copy of the order to this court. The briefing schedule in this appeal shall remain suspended pending further order of this court.

CHERRY, C.J., and SAITTA, GIBBONS, PICKERING, HARDESTY, and PARRAGUIRRE, JJ., concur.