Timothy **GERALD, Sheryl Gerald, and James Gerald, By and Through his Guardian, Bill Moen, Appellants–Plaintiffs,**

v.

**TURNOCK PLUMBING, HEATING AND COOLING, LLC., Appellee–Defendant.**

No. 71A04–0106–CV–245.

Court of Appeals of Indiana.

May 20, 2002.

Michael J. Anderson, Scott M. Keller, Anderson, Agostino & Keller, P.C., South Bend, IN, Attorneys for Appellants.

Daniel W. Glavin, Randall J. Nye, Beckman, Kelly & Smith, Hammond, IN, Vincent M. Campiti, Jr., Hunt, Suedhoff, Kalamaros, LLP, South Bend, IN, Attorneys for Appellee.

## OPINION

VAIDIK, Judge.

### Case Summary

Timothy Gerald, Sheryl Gerald, and James Gerald by and through his guardian Bill Moen (the Geralds) appeal the trial court's order disqualifying the law firm of Anderson, Agostino & Keller, P.C. (AAK) from representing them in this case. The Geralds argue that the trial court erred in disqualifying AAK because the two AAK attorneys who were previously employed by Hunt Suedhoff Kalamaros LLP (Hunt Suedhoff), the opposing law firm in this case, do not remember any of their work with Hunt Suedhoff concerning the Geralds' claims. The Geralds also argue that the trial court abused its discretion in disqualifying AAK because the firm instituted sufficient interoffice procedures to insure that confidential information was not passed between the two tainted lawyers and the rest of the law firm. Because we find that the subject matter between the present and prior representation is substantially related and because timely screening mechanisms were not placed around the two lawyers, we affirm.[1]

### Facts and Procedural History

On October 6, 1999, the Geralds filed suit against Turnock Plumbing, Heating and Cooling, LLC. (Turnock). Originally, Gonderman Legal Corporation, P.C. represented the Geralds in this case, and the lead role in Turnock's defense was held by Daniel Glavin of the law firm of Beckman, Kelly & Smith, which represented one of Turnock's insurance carriers. Hunt Suedhoff represented Turnock's other insurance carrier, Cincinnati Insurance (Cincinnati). During the initial stages of the litigation, Hunt Suedhoff was responsible for determining whether Geralds' claims against Turnock were covered by Cincinnati's policy.

In the early stages of this case, Pete Agostino, a partner at Hunt Suedhoff, reviewed the Geralds' claim file and responded to Cincinnati's coverage questions. In the spring of 2000, Agostino left Hunt Suedhoff. Agostino then became a partner at AAK on April 17, 2000. Meanwhile,

---

1. We held oral argument in this case on April 22, 2002, at the Valparaiso School of Law in Valparaiso, Indiana. We express our appreciation to the law school for its hospitality. In addition, we thank the attorneys for the high quality of their presentations.

back at Hunt Suedhoff, Julianne Parish was assigned to monitor the file relating to the Geralds' claims. During this period, Glavin provided Parish with periodic updates on the progression of the case, including his litigation strategy. On June 19, 2000, Parish went on maternity leave from Hunt Suedhoff and never returned to the firm.

On July 21, 2000, Michael Anderson of AAK entered his appearance in this case on behalf of the Geralds. Gonderman Legal Corporation withdrew from the case later that summer. An attorney for Hunt Suedhoff entered an appearance for Turnock on September 21, 2000. On November 24, 2000, Parish began working as a lawyer with AAK. During depositions on this case, Hunt Suedhoff discovered documents in its case file that had Parish's name on it, and Hunt Suedhoff brought the issue to AAK's attention. On December 22, 2000, AAK circulated an interoffice memo (Memo) that implemented measures "to restrict the dissemination of information about the *Gerald v. Turnock* Matter" and instructed that Agostino and Parish be insulated from the case. Appellants' App. p. 54–55.

On February 1, 2001, Turnock filed a Motion for Disqualification, which asserted that while employed with Hunt Suedhoff, Agostino and Parish "were privy to confidential, privileged, and sensitive defense-oriented work product." Appellants' App. 34–35. After holding a hearing on the Motion, the trial court entered its order on April 4, 2001, disqualifying AAK from representing the Geralds in this claim. This interlocutory appeal ensued.

### Discussion and Decision

The Geralds argue that the trial court erred when it disqualified AAK from representing the Geralds in this case. More specifically, the Geralds argue that the trial court abused its discretion by not

considering AAK's assertions that Agostino and Parish did not remember any of their work with Hunt Suedhoff concerning the Geralds' claims and that AAK instituted sufficient interoffice procedures to insure that confidential information was not passed between the two tainted lawyers and the rest of the law firm. We disagree.

■ Our supreme court has described a trial court's authority to disqualify an attorney "as necessary to prevent 'insult and gross violations of decorum.'" *Cincinnati Ins. Co. v. Wills*, 717 N.E.2d 151, 154 (Ind.1999) (citations omitted). A trial court may disqualify an attorney for a violation of the Rules of Professional Conduct that arises from the attorney's representation before the court. *Id.* We will review a trial court's decision to disqualify an attorney under an abuse of discretion standard. *Robertson v. Wittenmyer*, 736 N.E.2d 804, 806 (Ind.Ct.App.2000).

In this case, neither Turnock's Motion for Disqualification nor the trial court's order granting the motion specifically articulate which rule in the Indiana Rules of Professional Conduct supports AAK's disqualification. However, as both parties concede in their briefs, the Professional Conduct Rule that is invoked in this case is Indiana Professional Conduct Rule 1.10. Appellants' Br. p. 7; Appellee's Br. p. 7. Indiana Professional Conduct Rule 1.10 is entitled "Imputed Disqualification: General Rule" and provides:

> (a) While lawyers are associated in a firm, none of them shall represent a client if he knows or should know in the exercise of reasonable care and diligence that any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), 1.8(k), 1.9, or 2.2.

> *(b) When a lawyer becomes associated with a firm, the firm may not represent a person in the same or a sub-*

*stantially related matter if it knows or reasonably should know that that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(b) that is material to the matter.*

(c) When a lawyer has terminated an association with a firm, the firm is not prohibited from thereafter representing a person with interests materially adverse to those of a client represented by the formerly associated lawyer unless:

(1) the matter is the same or substantially related to that in which the formerly associated lawyer represented the client; and

(2) any lawyer remaining in the firm has information protected by Rules 1.6 and 1.9(b) that is material to the matter.

(d) A disqualification prescribed by this rule may be waived by the affected client under the conditions stated in Rule 1.7.

Prof. Cond. R. 1.10 (emphasis added). Because this case involves a possible conflict of interest that may be imputed to an entire firm due to the movement of lawyers from one firm to another, our analysis will focus on subsection (b) of Rule 1.10.

While Indiana courts have addressed the issue of imputed disqualification and the migration of lawyers between firms under the old Indiana Code of Professional Responsibility, this case appears to be one of first impression under the Indiana Rules of Professional Conduct.[2] The Indiana Code of Professional Responsibility required a lawyer to avoid even the appear-

ance of professional impropriety and that in certain situations the disqualification of one lawyer within a law firm meant that all members of the firm were also disqualified. *State v. Tippecanoe County Ct.*, 432 N.E.2d 1377, 1379 (Ind.1982). Under the Indiana Code of Professional Responsibility, this rule was strictly applied in the context of civil actions conducted by private firms. *Id.* However, the Indiana Rules of Professional Conduct provide that the rule of imputed disqualification should not be so rigid. Instead, the Comment to Professional Conduct Rule 1.10 identifies certain considerations that should be weighed in the administration of this rule:

First, the client previously represented must be reasonably assured that the principle of loyalty to the client is not compromised. Second, the rule of disqualification should not be so broadly cast as to preclude other persons from having reasonable choice of legal counsel. Third, the rule of disqualification should not unreasonably hamper lawyers from forming new associations and taking on new clients after having left a previous association.

Prof. Cond. R. 1.10, Comment. The Comment continues by suggesting that in protecting the interest of the previously represented client, this rule of disqualification should not be applied with such unqualified rigor that the opportunities for lawyers to move from one practice to another and for clients to change counsel are radically and unreasonably curtailed. *Id.* Instead, a functional analysis should be used in employing Rule 1.10; an analysis that seeks to preserve client confidentiality and to

---

2. Indiana Code of Professional Responsibility was in effect until January 1, 1987, when the Code was supplanted by the Indiana Rules of Professional Conduct. The Code of Professional Responsibility Disciplinary Rule 5– 105(d) provided that, "If a lawyer is required to decline employment or to withdraw from employment under DR 5–105, no partner or associate of his or his firm may accept or continue such employment."

avoid positions that are adverse to a previous client. *Id.*

■ While this case presents our first opportunity under the Indiana Rules of Professional Conduct to address the rule of imputed disqualification as it applies to lawyers who move between firms, the United States District Court for the Southern District of Indiana addressed this issue under Indiana Professional Conduct Rule 1.10 in the case of *Speedy v. Rexnord Corp.*, 54 F.Supp.2d 867 (S.D.Ind.1999). In analyzing the case under Indiana Professional Conduct Rule 1.10, the district court in *Speedy* applied the same functional analysis employed by the United States Seventh Circuit Court of Appeals for imputed disqualification cases. 54 F.Supp.2d at 868–69. While federal authority is not binding, this court may consult federal authority for guidance in interpreting Indiana Rules. *Finley v. Finley*, 174 Ind. App. 362, 364 n. 2, 367 N.E.2d 1126, 1127 n. 2 (1977). Because we find that the analysis employed by the Seventh Circuit for imputed disqualification cases embraces the principles espoused in our Rules of Professional Conduct, we adopt the test employed by the Seventh Circuit.

■ In determining whether an attorney should be disqualified, the Seventh Circuit has utilized a three-step test. This test employs a system of presumptions that must be rebutted by the law firm seeking to continue representation of a client when a new lawyer joins the firm after working in a firm that represented a client in a matter substantially related to the current representation, and the clients have adverse positions. Under this approach:

> First, we must determine whether a substantial relationship exists between the subject matter of the prior and present representations. If we conclude a substantial relationship does exist, we must next ascertain whether the presumption of shared confidences with respect to the prior representation has been rebutted. If we conclude this presumption has not been rebutted, we must then determine whether the presumption of shared confidences has been rebutted with respect to the present representation. Failure to rebut this presumption would also make disqualification proper.

*Schiessle v. Stephens*, 717 F.2d 417, 420 (7th Cir.1983) (citing *LaSalle Nat'l Bank v. County of Lake*, 703 F.2d 252, 255–56 (7th Cir.1983)); *Speedy*, 54 F.Supp.2d at 869.

■ When defining what constitutes a substantially related matter, our supreme court has looked to the facts of a case to determine if the issues in the prior and present cases are "essentially the same or are closely interwoven therewith." *In re Robak*, 654 N.E.2d 731, 734 (Ind.1995).[3] Before Hunt Suedhoff formally represented Turnock against the Geralds' claims, both Agostino and Parish worked for Hunt Suedhoff while the firm provided Cincinnati with answers on coverage questions stemming from the Geralds' claims against Turnock. Then, as attorneys for AAK, Agostino and Parish were employed by the law firm that was prosecuting the Geralds' claims against Turnock. While Hunt Suedhoff's original client was Cincinnati and not Turnock, we find that in this case the insurance company's interests were intertwined with Turnock's and that the Geralds' claims were materially adverse to both clients. In addition, we find that

---

**3.** We note that the Seventh Circuit standard for defining "substantial relationship" differs in some ways from the standard established by our supreme court. *See LaSalle,* 703 F.2d at 255–56.

even if the issues in the prior and present representations are not identical, they are so closely interwoven as to constitute substantially related subject matter for purposes of this test.

■ For the second step of the test, we analyze Agostino and Parish's representation at Hunt Suedhoff. Having found that there is a substantial relationship in the prior and present representations, there is a rebuttable presumption that the attorneys received confidential information during their prior representation. *Cromley v. Bd. of Educ. of Lockport Township High Sch. Dist. 205,* 17 F.3d 1059, 1064–65 (7th Cir.1994), *cert. denied,* 513 U.S. 816, 115 S.Ct. 74, 130 L.Ed.2d 28 (1994). The rebuttal can be established if the evidence presented "clearly and effectively demonstrate[s] that the attorney in question had no knowledge of the information, confidences and/or secrets related by the client in the prior representation." *Schiessle,* 717 F.2d at 420 (citation omitted). The evidence shows that not only were Agostino and Parish employed at Hunt Suedhoff during the relevant period of time, but both attorneys were also assigned to monitor the file relating to the Geralds' claims. Based on information supplied by Cincinnati, Agostino provided the insurance company with his opinion on whether Cincinnati's policy covered Turnock's exposure, and he instructed Cincinnati to continue to participate in the defense of the matter. After Agostino left Hunt Suedhoff, Cincinnati provided Parish with the insurance company's correspondence with Glavin as a way to keep her in the loop regarding the defense of the matter. This information included Glavin's case analysis and his estimate of the litigation budget. In addition to this information, Parish also requested that Glavin forward to her all discovery that he had received in the case. Thus, we find that the Geralds have failed to rebut the presumption that Agostino and Parish received confidential information relating to the Geralds' claim during their employment with Hunt Suedhoff.

■ Therefore, we turn to the final step of the three-part test. For the last step of the test, there is a rebuttable presumption that the knowledge possessed by one attorney in a law firm is shared with the other attorneys in the firm. *LaSalle,* 703 F.2d at 257. This presumption can be rebutted by a demonstration that specific institutional mechanisms (e.g., Fire Walls) were implemented to effectively insulate against any flow of confidential information from the infected attorney to any other member of his or her present firm. *Cromley,* 17 F.3d at 1065; *Schiessle,* 717 F.2d at 421 (citing *LaSalle,* 703 F.2d at 259); *Speedy,* 54 F.Supp.2d at 869. Types of Fire Walls that have previously been found to be sufficient are:

> (1) instructions, given to all members of the new firm, of the attorney's recusal and of the ban on exchange of information; (2) prohibited access to the files and other information on the case; (3) locked case files with keys distributed to a select few; (4) secret codes necessary to access pertinent information on electronic hardware; and (5) prohibited sharing in the fees derived from such litigation.

*Cromley,* 17 F.3d at 1065. In determining the effectiveness of these Fire Walls, courts have considered the size and structural division of the law firm; the infected attorney's position in the firm; and the likelihood of contact between the infected attorney and the attorneys responsible for the present representation. *Cromley,* 17 F.3d at 1065; *Schiessle,* 717 F.2d at 421. However, the overriding consideration in determining the effectiveness of a Fire Wall is that the "screening arrangement was set up at the time when the potentially

disqualifying event occurred, either when the attorney first joined the firm or when the firm accepted a case presenting an ethical problem." *LaSalle*, 703 F.2d at 259. *See also Cromley*, 17 F.3d at 1065; *Schiessle*, 717 F.2d at 421; *Speedy*, 54 F.Supp.2d at 869.

In this case, AAK circulated a Memo on December 22, 2000, that prevented Agostino and Parish from being assigned any work on the *Gerald v. Turnock* matter, prohibited Agostino and Parish from revealing information about the case to anyone associated with AAK, banned the rest of the firm from engaging in discussions with Agostino and Parish concerning the matter, and restricted access to files and documents on the matter to the attorneys in the firm who were working on the case. Appellants' App. p. 47–48. While we have some reservations about the effectiveness of the screening measures instituted by AAK in this case based on the small size of the firm and the fact that Agostino is a partner and would receive a portion of the fees, what we find truly damaging to AAK's claim that its screening mechanisms were effective is the timing of their implementation.

After Agostino left Hunt Suedhoff, he became a partner at AAK on April 17, 2000. On July 21, 2000, Michael Anderson of AAK entered his appearance in this case on behalf of the Geralds. Therefore, the potentially disqualifying event that should have triggered the implementation of the screening measures occurred either on July 21, 2000, or in the days immediately proceeding, when AAK accepted the Geralds' case. For the Fire Walls implemented by AAK to be successful, they should have been erected around Agostino when the firm accepted the case, not five

months later. In addition, even if we had found that Agostino had rebutted the presumption that he received confidential information during the prior representation, another potentially disqualifying event occurred when Parish joined the firm in November 24, 2000. Fire Walls should have been placed around Parish before her first day of work at AAK to insure that she was effectively screened from the matter.

Although we note that Agostino and Parish state in their affidavits that they did not reveal any information to the other lawyers at AAK about the matter and that they had in fact forgotten any particular facts about the case, the delay in implementing any type of screening mechanism negated its effectiveness. For a previously represented client to be reasonably assured that the principle of loyalty to that client has not been compromised, timely screening mechanisms are needed to ensure that information has not been shared, even if inadvertently. *See LaSalle*, 703 F.2d at 259. Even if no information is ever shared, the appearance of impropriety or the impression of shared confidences that can result from a failure to institute screening mechanisms can tarnish the reputation of the legal profession. The implementation of timely screening mechanisms insures that when lawyers form new associations, they do not inadvertently leave shattered trusts in their wake. In this case, AAK's Fire Walls were simply instituted too late to be effective, even though there is no indication that information was actually shared between the firm's attorneys. Therefore, we find that the trial court did not abuse its discretion when it disqualified AAK from representing the Geralds.[4]

4. We recognize that relying on memory alone to record every former client and issue from prior representations can be a daunting task; therefore, we encourage lawyers and law firms to institute some type of procedure that catalogs this information, so when lawyers

The Geralds also insinuate that the trial court was biased against them because the court interrupted counsel during the hearing on the Motion for Disqualification. Even though the trial court allowed the Geralds to finish their argument, they contend that the trial court's interruption indicates that the court had already decided the case without looking at all of the evidence and reading the Geralds' response memorandum. As further support for this argument, the Geralds invite this court to review the sealed envelope containing correspondence between Cincinnati and Agostino and Parish, which was filed with the trial court. The Geralds claim that the envelope containing the exhibits was always sealed indicating that the trial court never reviewed the evidence. After examining the envelope, we note that it has been stapled twice and that one set of staples has been removed; therefore, we conclude that the trial court examined the evidence and then resealed the exhibit.

 We presume that a judge is unbiased and unprejudiced. *Mitchell v. State,* 690 N.E.2d 1200, 1208 (Ind.Ct.App.1998). The Geralds' first Response and Memorandum in Opposition to Motion for Disqualification was filed on February 26, 2001, and their Supplemental Verified Response in Opposition to Motion for Disqualification was filed on March 15, 2001. On April 4, 2001, the trial court issued its Order of Disqualification, which explicitly noted that the court "examined the parties' written submissions and . . . heard the arguments of counsel." Appellants' App. p. 4. Therefore, we presume that the trial court examined the evidence and the Geralds' written submissions before it rendered its decision. Thus, we find that the trial court did not move from firm to firm, timely Fire Walls can be erected and the migrating lawyers do not blindly infect their new offices.

abuse its discretion and that it rendered an unbiased decision when it disqualified AAK from representing the Geralds, and we affirm the trial court's order.

Affirmed.

FRIEDLANDER, J., and BARNES, J., concur.