## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 27 2018, 10:12 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Danielle Sheff
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:
INDIANA DEPARTMENT OF
CHILD SERVICES

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis

ATTORNEY FOR APPELLEE:
CHILD ADVOCATES, INC.

Toby Gill
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re the Termination of the Parent-Child Relationship of:

D.C. (Minor Child)

and

J.R. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner,*

and

Child Advocates, Inc.,

*Appellee-Guardian Ad Litem.*

December 27, 2018

Court of Appeals Case No. 18A-JT-1250

Appeal from the Marion Superior Court

The Honorable Gary Chavers, Judge Pro Tem

The Honorable Larry Bradley, Magistrate

Trial Court Cause No. 49D09-1709-JT-818

**Tavitas, Judge.**

# Case Summary

J.R. ("Mother") appeals the termination of her parental rights to D.C. ("Child"). We reverse and remand for further proceedings.

# Issue

On appeal, Mother raises three issues, of which we find the first to be dispositive. We restate the dispositive issue as whether the trial court erred in failing to disqualify counsel for Child Advocates from his representation in the

termination proceedings where counsel previously represented Mother in a 2013 child in need of services ("CHINS") matter.

## Facts

[3] Mother is the biological parent of the Child. In 2013, after Mother tested positive for illegal substance use, the Marion County Office of Family and Children ("DCS") opened a CHINS action (the "2013 CHINS action") as to the Child and another child of Mother's, M. At the time, Mother was pregnant with twins. The 2013 CHINS action ended with a guardianship after Mother agreed to allow her brother, B.B., to serve as guardian for the Child and M. Attorney Ryan Gardner represented Mother in the 2013 CHINS action and prepared guardianship filings on behalf of B.B.

[4] On May 31, 2016, the Henry County Office of Family and Children initiated a CHINS action ("the 2016 CHINS action") as to the Child and M. due to "allegations of abandonment and educational and medical neglect" by Mother.[1] Appellant's App. Vol. II p. 15. The Child and M. were "ordered detained and placed outside [Mother's] home" at the June 1, 2016, initial hearing. *Id.* On December 22, 2016, the trial court determined that the Child was a CHINS

---

[1] On July 14, 2016, the 2016 CHINS action was transferred to Marion County, where the Child resided.

after Mother admitted that she lacked housing and financial means to provide for the Child.[2]

[5] On January 20, 2017, the trial court entered a dispositional order, in which it adopted DCS' recommendation and ordered Mother to participate in various services. In August 2017, citing Mother's lack of progress, DCS and the guardian ad litem ("GAL"), Child Advocates, recommended that the permanency plan for the Child should be changed from reunification to adoption.

[6] On December 2, 2017, DCS filed a petition for termination of Mother's parental rights to the Child. The trial court conducted the evidentiary fact-finding hearing on DCS' petition on April 23, 2018. DCS appeared by counsel, and Attorney Gardner appeared as counsel for Child Advocates. During a break in DCS' presentation of its case-in-chief, Attorney Gardner disclosed his previous representation of Mother in the 2013 CHINS action as follows:

> MR. GARDNER: Your Honor before DCS calls the next witness I wanted to . . . . I have a bit of candor toward the tribunal, so I wanted to make sure the court was aware. I don't believe that there's a conflict. I do not remember this case but apparently as I look through DCS' exhibits. If you'll remember this case was initially set before hand [sic], Jennifer Balhon, from our office was covering it once it got continued out it fell on my docket, but it looks like from the 2013 case I'm the one who

---

[2] According to the order of termination, M. "is still involved in a CHINS proceeding" and the permanency plan as to M. "is other than reunification." App. Vol. II p. 16.

handled the Guardianship or at least drafted it before it was two months before I left the Child Advocates, two months before I left I prepared the Guardianship for Mom's brother and was the Public Defender appointed to represent Mom, so I was on the case for a couple of months and I left I have had no involvement with this particular case obviously. I don't believe that my limited involvement with that case creates a conflict where I would not be able to continue on this case, but I did want to let everyone know that I was apparently the public defender in 2013 who was appointed to this case and I'm just realizing that.

THE COURT: That was the previous case?

MR. GARDNER: Yeah, the 2013.

THE COURT: Okay.

[Counsel for DCS]: We have no objection.

THE COURT: You just did the Guardianship paperwork? You really had nothing to do with . . . .

MR. GARDNER: I did [sic] really have anything to do with most of that case. As I read through the documents that were shown . . . . I left the Public Defender's office in June 2013. It looks [sic] I did the . . . I was appointed the 18th of May in 2013 so I was on there very briefly the fact finding rolled around and it looked like the plan was a Guardianship with her brother so I went ahead and prepared the paperwork for that but that was the extent of my involvement. I did want to let the court know that at least that I was and let the party know that I was appointed as Mother's PD for that brief period of time.

[Counsel for Mother]: And Mom believes that is a conflict based on at that [sic] in her words he was trying to help her out and now he's trying to take the kids away from her in her words, so she believes that is a conflict of interest.

MR. GARDNER: I would not [find a conflict of interest,] your Honor though it was two separate cases five years apart um I had very limited contact with Mom except for to prepare the paperwork for the Guardianship for her brother and after that actually after I prepared the paperwork I left the public defender's office. Mr. Hayden took over my docket and actually did the Guardianship hearing and since then I've had zero contact or involvement with the children or with mother, so I don't believe that context is recent enough or consistent enough to create the type of conflict that would require that I would not be able to cover this case, but I will defer to the courts, Judge.

THE COURT: Oh well you'll be on the case. . . . .

Tr. Vol. II pp. 30-32.

[7] The evidentiary hearing proceeded. DCS called witnesses and presented evidence, and Child Advocates agreed that adoption was in the Child's best interest. In an order, dated January 17, 2018, the trial court granted DCS' petition to terminate Mother's parental rights to the Child.

[8] On August 17, 2018, Mother submitted her brief of appellant. On September 17, 2018, Child Advocates filed a verified motion to reverse and remand and moved, in the alternative, for a new briefing schedule. Child Advocates argued that "remand is appropriate and 'necessary for the administration of justice.'" *See* Verified Motion to Remand, p. 2. Child Advocates further stated:

> If Child Advocates, Inc. were to file its brief, it would concede that the circumstances of this case create an appearance of impropriety, and that once it was determined that [Attorney] Gardner had represented Mother in a previous child in need of services case, even without any memory of mother or recollection of the facts of her previous case, because mother did not waive the potential conflict, he should have been disqualified as counsel for Child Advocates, Inc.

*Id*. at 3.[3]

[9] On October 4, 2018, DCS filed its brief of appellee, wherein DCS "agree[d] with Mother's statement of the facts relating to the attorney conflict of interest issue" and concurred with Child Advocates' concession of reversible error.[4] Appellee's Br. p. 5.

## Analysis

[10] Mother argues that the trial court abused its discretion when it denied her motion to disqualify Attorney Gardner from representing Child Advocates in the termination proceedings. We agree. Child Advocates concedes reversible error on the resulting conflict of interest issue, and DCS concurs.

---

[3] On November 27, 2018, Child Advocates filed a notice of intent to rest on verified motion to remand and to forgo filing a response to Mother's brief of appellant. We accepted Child Advocates' notice on October 2, 2018.

[4] DCS also argued that, "[t]o the extent this Court does not find Mother's issue dispositive regarding the conflict of interest . . . the evidence otherwise clearly and convincingly supports termination of Mother's parental rights. Mother does not challenge the court's findings of fact. The unchallenged findings—which must be accepted as correct—demonstrate the trial court's termination order is not clearly erroneous." Appellee's Br. p. 13.

[11] The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re K.T.K. v. Indiana Dept. of Child Services, Dearborn County Office,* 989 N.E.2d 1225, 1230 (Ind. 2013). "[A] parent's interest in the upbringing of [his or her] child is 'perhaps the oldest of the fundamental liberty interests recognized by th[e] [c]ourt[s].'" *Id.* (quoting *Troxel v. Granville,* 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)).

[12] "When the State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of due process." *In re G.P.,* 4 N.E.3d 1158, 1165 (Ind. 2014) (quotations omitted). "Likewise, due process protections at all stages of CHINS proceedings are vital because every CHINS proceeding has the potential to interfere with the rights of parents in the upbringing of their children." *Id.* (quotation omitted). Our supreme court has, thus, urged exercise of the utmost caution in "interfering with the makeup of a family and entering a legal world that could end up in a separate proceeding with parental rights being terminated." *In re K.D. & K. S., S.S. v. Ind. Dep't of Child Servs.,* 962 N.E.2d 1249, 1259 (Ind. 2012).

[13] It is well-settled that a trial court may disqualify an attorney for a violation of the Indiana Rules of Professional Conduct that arises from the attorney's representation before the court. *XYZ, D.O. v. Sykes*, 20 N.E.3d 582, 585 (Ind. Ct. App. 2014). This authority to disqualify "has been described as necessary to prevent 'insult and gross violations of decorum . . . .'" *Id.* We review a trial court's decision regarding disqualification for an abuse of discretion. *Id.* "An

abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it or it has misinterpreted the law." *Id.*

[14] Indiana Professional Conduct Rule 1.9(a) states, "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing."

[15] In *Sykes*, the plaintiffs sued a doctor and his employer-hospital for medical malpractice. The doctor subsequently moved to disqualify the law firm that represented the plaintiffs because that law firm employed an attorney who had previously represented the doctor in multiple medical malpractice cases. Although the imputed disqualification issue in *Sykes* arose in the context of a law firm, the panel's analysis is nonetheless instructive here.

[16] The *Sykes* court analyzed the issue under the following three-part test employed by the Seventh Circuit Court of Appeals:

> First, we must determine whether a substantial relationship exists between the subject matter of the prior and present representations. If we conclude a substantial relationship does exist, we must next ascertain whether the presumption of shared confidences with respect to the prior representation has been rebutted. If we conclude this presumption has not been rebutted, we must then determine whether the presumption of shared confidences has been rebutted with respect to the present

representation. Failure to rebut this presumption would also make disqualification proper.

*Sykes*, 20 N.E.3d at 586 (quoting *Gerald v. Turnock Plumbing, Heating, & Cooling, LLC,* 768 N.E.2d 498, 502 (Ind. Ct. App. 2002)).

[17] As to whether the prior and present representations were substantially related for purposes of Rule 1.9, the *Sykes* panel determined that (1) the attorney's prior representations of the doctor involved defending the doctor against claims of medical malpractice; and (2) the present representation – in which the attorney's new employer, the law firm, was representing the plaintiffs – involved one claim of medical malpractice and various related claims arising from the hospital's alleged failure to investigate the doctor's previous malpractice cases. The *Sykes* panel, thus, found "[t]he issues in the prior and present cases are undoubtedly closely interwoven . . . [and] there is a substantial risk that confidential factual information as would normally have been obtained in the prior representations would materially advance the Plaintiffs' position in the present case." *Id*. at 587. Accordingly, on the first prong of the test, the *Sykes* panel concluded that the prior and present cases were substantially related.

[18] Next, the *Sykes* panel considered the rebuttable presumption that the attorney had actually received confidential information from the doctor during the prior representation. As the *Sykes* panel stated, "we must determine whether the attorney whose change of employment created the disqualification issue was actually privy to any confidential information [her] prior law firm received from

the party now seeking disqualification of [her] present firm." *Id.* at 588 (quoting *Schiessle v. Stephens,* 717 F.2d 417, 420 (7th Cir. 1983)).

[19]     Citing comment three to Rule 1.9, for the proposition that "[a] conclusion as to whether a lawyer possesses such confidential information 'may be based on the nature of the services the lawyer provided the former client and information that would in ordinary practice be learned by a lawyer providing such services,'" the *Sykes* panel found that the presumption of shared confidences in the prior representations was not rebutted. Prof. Cond. R. 1.9, cmt. 3. The panel reasoned:

> It is undisputed that [the attorney] was the primary and, at times, only attorney representing Doctor in each of those prior medical malpractice cases. As such, [the attorney] was privy to much confidential information, including but not limited to Doctor's personal thoughts and mental impressions regarding the facts and circumstances and the strengths and weaknesses of those cases.

*Id.* at 588.

[20]     As to the final prong, whether "'there is a rebuttable presumption that the knowledge possessed by one attorney in a law firm is shared with the other attorneys in the firm,'" the *Sykes* panel concluded, pursuant to Rule 1.10(c), that no effort by the attorney's new employer, the law firm, to screen or "insulate against any flow of confidential information from [the attorney] to any member of her present law firm," would suffice because "imputed disqualification is per se and screening is not possible where the personally disqualified lawyer had 'primary responsibility' for the prior 'matter that causes the disqualification.'"

*Id.* (quoting *Gerald*, 768 N.E.2d at 505); *id.* (quoting Prof. Cond. R. 1.10(c)). The *Sykes* panel reasoned that, because the attorney served as the doctor's primary, and often only, attorney in the previous six medical malpractice cases, the law firm could not merely screen the attorney to avoid imputation of the conflict to the law firm.

[21] In rendering its judgment, the *Sykes* panel cautioned, "we must be cognizant that 'public trust in the integrity of the judicial process requires that any serious doubt be resolved in favor of disqualification'" and found that the doctor's claim raised "serious doubt" about the law firm's involvement in the litigation. *Id.* at 589. Accordingly, the *Sykes* panel concluded that the trial court abused its discretion in denying the doctor's motion to disqualify his former attorney's new employer-law firm from the proceedings. The *Sykes* panel reversed the trial court's judgment and remanded for further proceedings. We feel similarly constrained here.

[22] Here, as to whether the prior and present representations are substantially related for purposes of Rule 1.9, the 2013 CHINS action and the 2016 CHINS action each arose from DCS' claims that the Child was a CHINS and that Mother was unable to meet the Child's basic needs. There can be no reasonable dispute regarding this prong. The prior and present CHINS matters were substantially related.

[23] Nor can there be any doubt as to the second prong -- the rebuttable presumption that Attorney Gardner actually received confidential information from Mother

during the prior representation. By Attorney Gardner's admission, he served as Mother's primary counsel for approximately two months of the 2013 CHINS action; his recollection is that his role was limited to preparing guardianship materials for Mother's brother, B.B. Attorney Gardner's role was more involved, however, as Mother contends, without challenge from Child Advocates or DCS:

> In fact, Mr. Gardner did appear at a pre-trial hearing in the 2013 CHINS [action] as [Mother]'s counsel unrelated to the guardianship . . . and he also represented [Mother] at the CHINS fact-finding hearing. [ ] At the subsequent guardianship hearing, Mr. Gardner appeared as [Mother]'s brother's private counsel.

Appellant's Br. p. 25. Mother argues further, and we agree, that:

> In the ordinary course of such representation, the attorney would necessarily learn information about [Mother]'s relationship with, and acts or omissions with regard to, [the Child]. The only logical conclusion that could be reached from Mr. Gardner's representation of [Mother] in the CHINS proceedings is that confidential information had been disclosed in the course of his representation of [Mother].

*Id*. at 26. In recognition of the practical aspects of representing a parent in CHINS proceedings, with the not-insignificant potential for termination of parental rights, we find that the presumption that Attorney Gardner actually received confidential information from Mother during the prior representation has not been rebutted here.

As to the final prong of the *Gerald* test, whether "there is a rebuttable presumption that the knowledge possessed by one attorney in a law firm is shared with the other attorneys in the firm," we need only look to Child Advocates' concession below:

> . . . [T]he circumstances of this case create an appearance of impropriety, and that once it was determined that [Attorney] Gardner had represented Mother in a previous child in need of services case, even without any memory of mother or recollection of the facts of her previous case, because mother did not waive the potential conflict, [Attorney Gardner] should have been disqualified as counsel for Child Advocates, Inc.

Verified Motion to Remand, p. 3.

For the foregoing reasons, we find that the trial court abused its discretion in denying Mother's motion to disqualify Attorney Gardner from representing Child Advocates, an adverse party to Mother, in the 2016 CHINS action, where Attorney Gardner previously represented Mother in the 2013 CHINS action.

## Conclusion

Given Attorney Gardner's previous representation of Mother in a substantially related matter, the trial court abused its discretion in denying Mother's motion to disqualify Attorney Gardner from his subsequent representation of an adverse party, Child Advocates, in an action involving Mother. We reverse the trial court's order terminating Mother's parental rights to the Child and remand for further proceedings consistent with this opinion.

Reversed and remanded for further proceedings.

Brown, J., and Altice, J., concur.